**In re McLEAN INDUSTRIES, INC., et al., Debtors.**

**Bankruptcy Nos. 86 B 12238 (HCB)—86 B 12241 (HCB).**

United States Bankruptcy Court, S.D. New York.

March 24, 1988.

Milbank Tweed Hadley & McCloy, New York City by Alan W. Kornberg, Stephen J. Shimshak, Robert D. Drain, Lorraine M. Stinnette, for debtors.

White & Case, New York City by Allan L. Gropper, for Creditors Committee.

---

Kelley, Drye & Warren, Freehill, Hogan & Mahar, New York City, by Nathan J. Bayer, Alexander F. Vitale, Sandra E. Mayerson, for General Elec. Credit Corp.

## DECISION AND ORDER

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

United States Lines, Inc., debtor and debtor-in-possession ("U.S. Lines"), and its affiliated debtors and debtors-in-possession, McLean Industries, Inc. ("McLean"), First Colony Farms, Inc. ("First Colony") and United States Lines (S.A.), Inc. ("S.A.)" (collectively, the "Debtors"), have moved for an order authorizing and approving a Stipulation and Agreement of Settlement (the "Agreement"). The Agreement provides for a compromise and settlement of all disputes between the Debtors and The Prudential Insurance Company of America ("Prudential") concerning Prudential's alleged interests in certain sea-going vessels known as the AMERICAN APOLLO, AMERICAN AQUARIUS, AMERICAN ASTRONAUT, AMERICAN LANCER, AMERICAN LARK, AMERICAN LEGION, AMERICAN LIBERTY, and AMERICAN LYNX (collectively, the "Lancers") and the AMERICAN VETERAN (collectively, the "Vessels") and the Vessels' proceeds and earnings.

The disputes concern:

(a) the extent of Prudential's mortgage interests in the Vessels and U.S. Lines' ability to avoid those interests for the benefit of its estate (the "Mortgage Dispute");

(b) Prudential's claims to the Vessels' freights and charter hire subsequent to U.S. Lines' defaults under the mortgages in favor of Prudential and all rights which Prudential may have to adequate protection of its alleged interests in the Vessels (the "Proceeds and Use Dispute"); and

(c) the extent and recoverability, as against Prudential, of the Debtors' claims principally under § 506(c) of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), for costs and expenses incurred post-petition to preserve and dispose of the Vessels (the "506(c) Dispute").

A hearing was held on March 21 and 22, 1988. General Electric Credit Corp. ("GECC") and certain injured seamen formerly engaged by U.S. Lines or S.A. have objected to the motion.

### I.

#### A.  *The Mortgage Dispute*

The facts concerning the Mortgage Dispute adduced at the hearing do not vary materially from those found in this Court's decision of July 29, 1987 with respect to Prudential's prior motion of May 15, 1987 for an order vacating the automatic stay to permit it to foreclose on the Vessels. *See In re McLean Industries, Inc.,* 76 B.R. 328 (Bankr.S.D.N.Y.1987). Familiarity with that decision is assumed.

Briefly and as supplemented at the hearing, Prudential, as mortgagee, and U.S. Lines, as owner/mortgagor, entered into duly perfected first preferred ship mortgages dated April 12, 1978 collateralized by the Lancers and a second preferred ship mortgage collateralized by the American Veteran to secure the Debtors' obligations pursuant to a note purchase agreement and financing and security agreement dated as of the same date. The mortgages were duly recorded with the Coast Guard and endorsed on the documents of the Vessels on April 19, 1978. As examples of these documents, copies of Certificate of Documentation and of the relevant pages of the Abstract of Title and Certificate of Ownership with respect to the American Lancer are appended hereto.

In April 1983, the 1978 agreements were amended and the original mortgages were amended and superseded by a duly perfected first preferred ship mortgage (the "First Preferred Mortgage") between U.S. Lines as owner/mortgagor and Prudential as mortgagee in the principal amount of $126,859,753.54.[1] Notes in the same amount

---

1. The documents, in each case conveyed a second preferred mortgage with respect to the

AMERICAN VETERAN. There does not appear to be value in that vessel sufficient to pay the

and referred to in the documents as the 1983 Company Notes were also issued to Prudential. The First Preferred Mortgage was duly recorded with the Coast Guard on April 21, 1983 and subsequently endorsed on the Vessels' documents.

In conjunction with the First Preferred Mortgage, U.S. Lines issued notes approximating $114,000,000 to Prudential and GECC and granted a second preferred ship mortgage on the Vessels in favor of United States Trust Company, as trustee for Prudential and GECC as noteholders (the "Second Preferred Mortgage") to secure that debt. The Second Preferred Mortgage was also recorded with the Coast Guard on April 21, 1983 and subsequently endorsed on the Vessels' documents. By these documents, the amount owed to Prudential and GECC is expressly subordinated to the debt collateralized by the First Preferred Mortgage.

What happened next is the gravamen of this dispute. In early 1986, U.S. Lines apparently could no longer comply with certain financial covenants contained in its various financing agreements with Prudential, GECC and with certain banks who held first preferred ship mortgages on twelve other exceptionally large container ships known as the Econships. It thereupon sought to renegotiate the terms of those various agreements. That renegotiation led, *inter alia*, to an amendment in April 1986 of U.S. Lines' financing and security agreement with Prudential, known as Amendment 1986–1, and to an amendment of the First Preferred Ship Mortgage known as Amendment No. 1. Amendment 1986–1 recited that "[a]s of January 1, 1986, there remained outstanding $92,885,-000 in aggregate principal amount of 1983 Company Notes." It is undisputed that, in fact, that sum was then outstanding and remains unpaid.

The mortgage amendment, Amendment No. 1, while reciting that all capitalized

terms are defined in Amendment 1986–1, provided, however:

As of January 1, 1986 there remained outstanding $92,885.00 in aggregate principal amount of the 1983 Company Notes....

To this it added:

For the purpose of this Mortgage and the endorsement hereof on the marine document of the Vessel as required by the Ship Mortgage Act, 1920, as amended, (a) the total amount is $92,885.00 (the aggregate principal amount of 1983 Company Notes and Additional Notes, if any, now outstanding) and interest and performance of mortgage covenants, and (b) the date of maturity is October 15, 1991 and (c) the discharge amount is the same as the total amount.

With Amendment 1986–1 annexed to it as an exhibit, Amendment No. 1 was duly recorded with the Coast Guard on April 15, 1986 and the Coast Guard indices were amended to reflect a reduction in the discharge amount to $92,885.00. The certificates of ownership and documentation for each Vessel were amended in similar fashion.

This realization of the corporate and admiralty lawyer's nightmare apparently occurred simply because Amendment No. 1 was delivered towards the end of the closing held on April 14, 1986 and the admitted typographical errors contained therein were simply not discovered by the various parties, including Prudential and GECC, who gave their consents to the execution of the documents.

The renegotiated terms were insufficient to avert the demise of U.S. Lines. In October 1986, it defaulted on its obligations to Prudential and tipped into bankruptcy with the filing of the Debtors' petitions on November 24, 1986.

**B.  *The Proceeds and Use Dispute***

Immediately after the filing of the petitions, Prudential requested this Court to

---

first preferred mortgage held by the Secretary of Transportation to secure a debt of roughly $3 million. Thus, it is of little, if any, concern here. Amendment No. 1, referred to *infra*,

amended the second preferred mortgage. Because of the lack of significance, the distinction is not made in the text.

enter an order to show cause bringing on a motion seeking to vacate the automatic stay imposed by 11 U.S.C. § 362(a) with respect to the Vessels. Because the standard of Local Rule 13(d) had not been complied with, the order was not entered. Thereupon, Prudential and U.S. Lines negotiated a stipulation approved by this Court on December 3, 1987. It stated that Prudential claimed to be entitled, pursuant to the First Preferred Mortgage, to cash collateral consisting of freights, charter hires, rents issues and profits generated by the Lancers and that U.S. Lines disputed the claim. Since the parties were attempting to negotiate their differences, the stipulation provided that U.S. Lines could use up to $6.6 million of cash collateral with both parties reserving all rights.

U.S. Lines, in June 1986, had chartered the Lancers to S.A. for use in its South American trade. That business folded in April 1987. Five of the Lancers thereupon went into lay-up in New York Harbor. It is stipulated that S.A. owes charter hire of $1.995 million for the four month period and had income from freights of roughly $9 million. Three Lancers were chartered to Sea Land Services, Inc. ("Sea Land") pursuant to an agreement approved by order of this Court, in July 1987. By virtue of that agreement, charter hire of $1.223 million was paid to Prudential by Sea Land with the Debtors reserving all rights to recover that sum. Furthermore, Sea Land agreed to make certain minimum bids with respect to the Lancers upon their arrest and sale in United States admiralty courts.

### C. *The 506(c) Dispute*

After five of the Vessels went into lay-up in New York Harbor, U.S. Lines expended $1.2 million for preservation costs, including wharfage, insurance and electricity, to maintain the Vessels.

### D. *The Prior Decision of this Court*

By motion dated May 15, 1987, Prudential sought an order vacating the automatic stay. This Court ordered that the stay was to be modified to permit arrest and foreclosure of the Vessels but ordered that the Mortgage Dispute should be resolved here and precluded distribution of proceeds realized on sale of the Vessels pending further order of this Court. In asserting that the Mortgage Dispute should be initially heard by the admiralty courts, Prudential argued that the dispute concerned state law and admiralty law issues. It did not then claim that Amendment No. 1 should be reformed to correct the typographical error. The order implementing the decision was appealed by Prudential.

### E. *The Settlement*

After their arrest in the Fall of 1987, the five Lancers in New York Harbor were sold for an aggregate sum in excess of $40 million. With the minimum bids Sea Land is obligated to make, the eight Lancers will realize a gross sum in excess of $50 million. Against this sum are to be charged maritime liens having statutory priority over preferred mortgage liens. The Debtors calculate that these liens will amount to roughly $500,000 in light of insurance that covers many of the claims, particularly those of injured seamen. Since the time for filing claims in the admiralty proceedings has not yet expired, there may be additional claims, but there is no suggestion that priming claims will exceed $1 million net of insurance.

The settlement is an integrated arrangement that resolves the three disputes by basically providing for payment by Prudential to U.S. Lines of a portion of the proceeds it receives from the sale of the Vessels with respect to either the First Preferred Mortgage or the Second Preferred Mortgage. After reimbursement of Prudential's proper and reasonable costs, excluding attorneys' fees, in connection with the foreclosure proceedings against the Vessels, U.S. Lines is to receive $450,000 in full settlement of the 506(c) Dispute and an amount equal to 17.5% of Adjusted Net Recoveries as defined in the Agreement. Furthermore, U.S. Lines is to retain 17.5% of any amounts recovered by U.S. Lines from parties other than Prudential in respect of U.S. Lines' claims under 11 U.S.C.

§§ 506(c) and 552(b), and to pay the remaining 82.5% of such amounts to Prudential.

In addition, the Settlement provides for Prudential to retain the approximately $1.22 million of charter hire paid by Sea Land and for Prudential to waive in favor of the Debtors all of its rights to approximately $2 million allegedly due U.S. Lines from S.A. for the use of the Lancers chartered to S.A. and all its claims for freights.

The Agreement also obligates the Debtors and Prudential to cooperate in the Vessels' disposition and in defeating attacks on Prudential's First Preferred Mortgage. It appears that the principal attack will be waged by GECC. As set forth in its supplemental brief, it will contend that the First Preferred Mortgage is limited in its preferred status to $92,885 and that the remainder of proceeds from the Vessels should be distributed pursuant to the Second Preferred Mortgage in which it holds a half interest. If GECC does not prevail in its attempt to limit the First Preferred Mortgage to $92,885, the Debtors estimate a recovery of approximately $8.9 million including the $450,000 of § 506(c) costs. If GECC does prevail, the Debtors should recover approximately $4.6 million.

## II.

In assessing a settlement, where there is no claim that it constitutes a *de facto* plan of reorganization, the Court is to determine if it "falls below the lowest point in the range of reasonableness," *Anaconda-Er-icsson, Inc. v. Hessen (In re Teltronics Services, Inc.)* 762 F.2d 185, 189 (2nd Cir. 1985) (citations omitted) and, in doing so, assess

"(a) the probability of success in the litigation;

(b) the difficulties, if any, to be encountered in the matter of collection;

(c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and

(d) the paramount interest of the creditors and a proper deference to their reasonable views in the premise."

*In re Lion Capital Group,* 49 B.R. 163, 175 (Bankr.S.D.N.Y.1985) (collecting cases).

It is elementary that in making this assessment, if an objection is lodged to a settlement, the Court is to be presented with "a record containing adequate information." *Lion Capital,* 49 B.R. at 176. Upon that record, the Court is not obligated to approve a settlement at the lowest level of reasonableness. It has discretion to be exercised in producing a just result. *Ibid.*

## III.

■ Here GECC and the mariner objectors assert that not enough is known. While the mariners have not pressed their objection, GECC asserts that until the sale price of the remaining three vessels is known the Court lacks adequate information.

Were the settlement capped in amount, we would agree and GECC's motion for an adjournment, made at the commencement of the hearing, would have been granted. But the settlement amount is not so capped and Sea Land is obligated to make minimum bids on the remaining three Lancers. Any increase will only redound to the Debtor's benefit under the 17.5% formula. While the ultimate result of GECC's challenge to the First Preferred Mortgage will likely take years to resolve, the unknown often gives rise to settlements. Its presence does not preclude the making of a record sufficient to assess the factors listed above.

## IV.

■ With respect to those four factors, there is no issue here as to the probability of collection. The vessel proceeds will be distributed first by the admiralty courts with respect to priming liens and then by this Court with respect to the mortgages pursuant to the decision of July 29, 1987. That the Debtors may have 506(c) claims against priming lienholders, principally seamen, is no longer of significant concern. It became perfectly clear at the hearing, for the reasons discussed below, that the likelihood of their sustaining such claims is *de minimus.*

Nor is delay in collection a factor. As stated in our earlier decision, no funds are to be distributed until priming liens are resolved. 76 B.R. at 338.

As to complexity, the facts are straight forward and largely undisputed. Only GECC's knowledge, see 46 U.S.C. § 921(a), is a truly factual issue. But even there, although there was no direct evidence of its knowledge presented at the hearing, it seems inconceivable that a party as sophisticated as GECC and its able counsel could hardly have entered into the 1986 renegotiation without knowledge of the actual amount owed Prudential.[2]

As to expense, the Debtors have run up fees of $200,000 to fully research the issues and will likely double that in defending Prudential's appeal, trying the matter and pursuing or defending their claim on appeal.

The views of the creditors, here, the Official Creditors Committee and GECC, are largely based on the differing assessments by able counsel of the Debtors' probability of success in setting aside all but $92,885 of Prudential's First Preferred Mortgage. But the Committee and the Debtors also contend that resolution of this dispute is necessary to avoid further delay in formulation of a plan of reorganization. That is so apparently because of Prudential's standing as a major creditor of McLean and First Colony Farms pursuant, *inter alia*, to their guarantees of U.S. Lines obligations. *See also In re McLean Industries, Inc.*, 70 B.R. 852, 854 (Bankr.S.D.N.Y.1987). To be sure, the settlement only serves to reduce those obligations, not to resolve them. In this case, it might be too much to ask for full resolution at this stage. The nature of the dispute being in the embarrassing nature of a typographical error reducing the amount of a mortgage lien to one thousandth of its intended sum gives credence to the notion that this dispute requires resolution before other building blocks of a plan of reorganization can be put in place.

We thus turn to examination of the complexity of the legal issues and the Debtors' probability of success.

## V.

### A. *The Mortgage Dispute*

The Mortgage Dispute presents a case of first impression. The complexity of Prudential's claim of substantial compliance with the recordation and endorsement provisions of the Ship Mortgage Act, 46 U.S.C. §§ 921, 922 and other legal issues is easily seen from the discussion at 76 B.R. 334–36 which is fully applicable but not repeated here. That complexity is increased, moreover, by the appellate decision in *In re Alberto*, 823 F.2d 712, [CCH] Bank.L.Rep. ¶ 71,897 (3d Cir.1987), which was not in print when our decision was entered. It is further increased by the inevitable outcome of this Court's decision, *i.e.:* that Prudential's claim of a lien in the full amount of $92,885,000 must be considered by this Court of equity and thus raises the obvious issue of reformation.

While the *Alberto* Court ruled that federal law exclusively governs and thereby reduced Prudential's state law arguments to analogies, it adds far more complexity in its holding that the avoiding power a bankruptcy trustee pursuant to the lien creditor status of 11 U.S.C. § 544(a)(2) is governed by examination of the scope of inquiry that a diligent creditor would have made and the facts that such inquiry would have disclosed.

In *Alberto*, a ship mortgage in favor of a bank had been filed with the Coast Guard prior to the debtor's bankruptcy but was not recorded, indexed and endorsed on the vessel's documents until after the bankruptcy petition was filed. That subsequent recordation and endorsement was held to violate the automatic stay of 11 U.S.C. § 362(a). It was thus ineffective and failed

---

2. In its brief, GECC states that its knowledge is irrelevant for in its view a first preferred ship mortgage may not be accorded preferred status over a duly recorded and endorsed second preferred ship mortgage regardless of the knowledge of second preferred ship mortgagee if the endorsement requirements of 46 U.S.C. § 922 have not been fulfilled. The issue of GECC's knowledge may not be relevant to the Debtors' claim against Prudential.

to create a preferred ship mortgage. *Alberto*, 823 F.2d at 722–23.

Nevertheless, the Court considered whether the mortgage was valid in the face of claims by a trustee in bankruptcy. In so doing, it described the process at the Coast Guard and the consequences of each step:

> The [Ship Mortgage Act] envisions a two-step process for a ship mortgagee to perfect its security interest in a federally documented vessel. First, recordation of a ship mortgage is required for the mortgage to be valid against persons other than the mortgagor, his heirs or devisees, and persons with actual notice of the mortgage. *See* 46 U.S.C. §§ 921, 1012. Prospective non-maritime creditors are put on notice of the mortgage by its recordation with the Coast Guard at the vessel's home port. Upon recordation, the ship mortgage is valid and has priority over all subsequent non-maritime liens. *See Morse Drydock & Repair Co. v. S.S. Northern Star*, 271 U.S. 552, 554 [46 S.Ct. 589, 589, 70 L.Ed. 1082] ... (1926); *Jackson v. Inland Oil & Transport Co.*, 318 F.2d 802, 810 (5th Cir.1963).

> To obtain the protections of preferred mortgage status, *see* 46 U.S.C. § 953, a mortgagee must comply with the additional conditions of 46 U.S.C. § 922. A ship mortgage does not achieve preferred mortgage status until the mortgage is both recorded and subsequently endorsed upon the vessel's documents. *Morse Drydock*, 271 U.S. at 555–56 [46 S.Ct. at 590] ... Once a mortgage has achieved preferred mortgage status, it has priority over all claims against the vessel except for maritime liens arising before the recording and endorsement of the preferred mortgage, certain maritime liens whenever arising, and expenses and fees allowed and costs taxed by the court. 46 U.S.C. 953.

*Alberto* 823 F.2d at 717. Drawing applicable considerations from the purpose of the Ship Mortgage Act, the doctrine of substantial compliance and analogous state law, the Court held that "a ship mortgage is valid against third parties [including a trustee in bankruptcy having § 544(a)(2) status] when properly filed with the Coast Guard and retained by it in a manner that permits diligent prospective creditors to learn of the mortgage[e]'s pre-existing lien on the mortgaged vessel." 823 F.2d at 721.

This holding has several ramifications. Most importantly, the Court imposed a duty of inquiry on a hypothetical execution creditor and seemed to agree that a bankruptcy trustee's lien is non-maritime. *Alberto*, 823 F.2d at 717, n. 8. To the *Alberto* Court, examination of facts that reasonable inquiry would reveal is commanded by the underlying congressional purpose of furthering ship financing and thus development and maintenance of a United States merchant fleet.

While this holding is new and has yet to be considered by courts in this Circuit, it, as the ruling of a Court of Appeals, will be accorded considerable deference. In according that deference, it can hardly be said, as GECC claims here, that there are no facts that support Prudential's defense against the Debtors' challenge to the mortgage.

On this record, it is plain that there is no accepted practice regarding the limit of inquiry performed by admiralty counsel for a prospective creditor with respect to a recorded, indexed and endorsed mortgage. Whether counsel would look beyond a vessel's documentation depends on the circumstances of each case. Here, a trier of fact could easily find that diligence would have required such inquiry. The Vessels' documents show that mortgages ranging from $48 million to over $100 million were placed on each of the Lancers in 1978 and that there were two mortgages amounting to over $200 million agreed to in 1983. They further show that ship financing of these Vessels concerned millions of dollars. One could think that a diligent creditor would seriously question how it is that some $126 million had been repaid from 1983 to 1986, when the index disclosed no new financing and why parties dealing in exceptionally large sums would go to the trouble of amending a mortgage to reflect only a $92,-885 debt. These concerns would reason-

ably lead to further inquiry and thus examination of the underlying documents. In this case, it is unquestioned that examination of Amendment No. 1 would have revealed the discrepancy since Amendment 1986–1 was attached to it and stated the correct amount.[3]

To this GECC replies that inquiry is not the issue and that a preferred ship mortgage can only be preferred if endorsed on the Vessel documents. This argument ignores the differing effects of the two step process spelled out by the *Alberto* Court. No Court in any opinion of which we are aware has held that a trustee's lien under § 544(a)(2) is a maritime lien. Nor does GECC claim that the trustee's lien is a maritime lien.[4] Since the Debtors' challenge is grounded on their § 544(a)(2) status, the issue of inquiry, in the Debtors' dispute with Prudential, arises at the recordation step, not endorsement.

Secondly, this argument ignores that the Vessels' documents plainly reflect endorsement of Prudential's First Preferred Mortgage in 1983. Thus, the mortgage was endorsed and achieved preferred status pursuant to 46 U.S.C. § 922. The question on this score is not whether the mortgage achieved preferred status but the effect of the typographical errors of Amendment No. 1 which were subsequently reflected on the Vessel documents and stated that only $92,885 was due.

These observations bring us to the second area of additional complexity: whether this Court, since it has retained the issue, would order reformation of Amendment

No. 1 in the action brought by the Debtors. To this inquiry raised by the Court two threshold responses are made. First, it is said that it is a non-issue since Prudential has not requested reformation. Second, it is asserted that reformation cannot be ordered against a bankruptcy trustee. With respect to the first assertion, that Prudential has not formally demanded reformation is of no consequence since, given the settlement negotiations, its time to answer has been repeatedly adjourned. That it did not raise the issue in its prior papers filed in support of its motion to vacate the automatic stay is due, we suspect, to its unaccountable desire to have the admiralty courts decide the issue and the concern that limitations on the ability of admiralty courts, *see Rea v. The Eclipse*, 135 U.S. 599, 10 S.Ct. 873, 34 L.Ed. 269 (1890), as opposed to the undoubted ability of bankruptcy courts, to order reformation would be used against it on that motion. Since the case is to be resolved here, we have little doubt that Prudential would raise the claim.

■ The second of these points is simply erroneous. The very cases cited for the proposition that reformation cannot be ordered against a bankruptcy trustee, *see e.g. In re Robinson*, 38 B.R. 255, 257 (Bankr.D. Maine 1984), make no such claim. Rather, those courts examine whether, under state law, reformation could be ordered against an entity having the judgment lien creditor status granted by § 544(a)(1), the execution lien creditor status of § 544(a)(2) or the status of a bona fide purchaser of real property conferred by § 544(a)(3).[5]

---

**3.** No one disputes, unlike in *Alberto,* that Amendment No. 1 was available for inspection at the Coast Guard offices in New York. GECC asserts that its counsel recently requested certified copies of the Second Preferred Mortgages with respect to all the Lancers and after some delay received complete sets with respect to six of those ships and incomplete sets with respect to two ships. Thus, it obtained the documents from the Coast Guard. The Debtors do not expressly claim that Amendment No. 1 was available for inspection on board the Vessels given the testimony of a former U.S. Lines master that such documents were not made available to third parties without prior authorization.

**4.** Since ships are personal property only the execution lien status of § 544(a)(2) can apply.

§ 544(a)(1) judgment liens pertain to realty as does the bona fide purchaser status of § 544(a)(3). *See* 76 B.R. 334–35.

**5.** Such a case is *In re White Beauty View,* 81 B.R. 290 (Bankr.M.D.Pa.1988) on which GECC relies. There a mortgage on real property failed to fully embrace all of the real property intended. After the debtor filed for bankruptcy and a trustee was appointed, the mortgagee was permitted to foreclose and discovered the error. It sued the trustee seeking reformation. State law precluded reformation against a subsequent bona fide purchaser of real property. Thus, even though there was a mutual mistake of fact giving rise to reformation, the mortgage could not be reformed since the trustee had the

In this the states vary. While reformation will not be ordered against a bona fide purchaser for value, many states hold that reformation can be ordered against judgment and execution creditors. *See Annot.* 44 A.L.R. 78, 92, 104; *Annot.* 79 A.L.R.2d 1180, 1199, 1214. In those states where reformation will not be ordered against a judgment lien creditor, *see e.g. Lowery v. Wilson,* 214 N.C. 800, 200 S.E. 861 (1939), a recordation statute expressly protecting creditors in addition to bona fide purchasers for value is held to preclude reformation in the face of an intervening judgment lien. *Id.* 200 S.E. at 863–64. While state law is not governing, no one disputes that its use as analogy is clearly permitted in admiralty cases.

The complexity of a reformation issue lies, therefore, not in the threshhold issues raised or in the mutual mistake of fact needed to reform, *see, e.g., Thrasher v. Rothrock,* 377 Pa. 562, 105 A.2d 600 (1954), but in the more discrete analysis of the indexing and recordation statute, § 921(b) of the Ship Mortgage Act. This exercise will involve, as in *Alberto,* consideration of the purpose of these sections and whether they are designed to protect non-maritime execution creditors from reformation in the absence of prejudice to third parties, all in light of the overall purpose of the statute.

The *Alberto* Court performed a somewhat similar exercise in analyzing the related issue of the ability of a bankruptcy trustee to challenge a filed but unrecorded ship mortgage. In constructing its test of reasonable inquiry, the Court relied on the substantial compliance cases such as *Morgan Guaranty Trust Co. v. Hellenic Lines, Ltd.,* 621 F. Supp 198 (S.D.N.Y.1985) that emphasize "good faith efforts to comply with the Act," *id.* at 215, and absence

of prejudice to third parties. It put aside such strict construction authorities such as *Port Welcome Cruises, Inc. v. S.S. Bay Belle,* 215 F.Supp. 72, 78 (D.Md.1963) and quoted *The NAN B,* 78 F.Supp. 748, 749–50 (D.Alaska 1948) as setting forth the applicable standard of interpretation:

> "[T]he statute here involved should be strictly construed so far as the protection of creditors and lienors from fraud and like acts is concerned, but liberally construed to effectuate the object of the statute to make investments in shipping, and ship mortgages more attractive and secure."

In this case, similar reasoning could lead to reformation notwithstanding the non-maritime intervening execution lien status conferred on the Debtors by § 544(a)(2).[6]

In short, the legal issues concerning the Mortgage Dispute initially considered by this Court remain complex, Prudential has strong arguments under *Alberto* that could enable it to prevail, the satisfaction of all of the recordation, indexing and endorsement requirements with respect to the First Preferred Mortgage in 1983 gives it a cogent argument that that status was not reduced by the typographical error in 1986 and it has a substantial case for reformation against these Debtors.

### B. *The Proceeds and Use Dispute*

Not as complex is the Proceeds and Use Dispute. The granting clause of the First Preferred Ship Mortgage makes no reference to freights, charter hire or even income. It provides that

> [S]hipowner has granted, conveyed, mortgaged, pledged ... unto the Mortgagee ... and does by these presents grant a security interest to them in, the

---

§ 544(a)(3) status of a bona fide purchaser of real property.

**6.** Further complicating all this is whether the admiralty court could order reformation and if not, whether the bankruptcy court should entertain such a plea. It would appear that the admiralty court would have jurisdiction to reform Amendment No. 1 here since it would have jurisdiction to entertain an arrest brought on the basis of the First Preferred Mortgage and Amendment No. 1 since they are recorded and

documented at least in the amount of $92,885. Being originally vested with jurisdiction and thus "the cause of suit was itself maritime," the court should then be able to exercise that jurisdiction to order reformation. *Rice v. Charles Dreifus Co.,* 96 F.2d 80, 82–83 (2d Cir.1938); *see also Avondale Shipyards, Inc. v. Tank Barge ETS 2303,* 754 F.2d 1300, 1986 A.M.C. 2200 (5th Cir. 1985); *Merchants & Marine Bank v. T.E. Wells,* 289 F.2d 188 (5th Cir.1961).

whole of the Vessels described more fully in Schedule A ... together with all of the boilers, engines, machinery, masts, spars, rigging, boats, anchors ... and all other appurtenances to said Vessel appertaining or belonging, whether now owned or hereafter acquired whether on board or not ...; *provided, further*, that the foregoing in each case shall not include any property other than the "vessel" within the meaning of the Ship Mortgage Act, 1920....

First Mortgage at 3, ¶ 3. (Emphasis in original.). Section 19 affords, Prudential, on default, with the right to take possession of the Vessels and sell them. Complementing that provision is Section 21 which provides that on default, Prudential may have the remedy of collecting, as attorney in fact of U.S. Lines, "all freights, hire, earnings, issues, resumes, income and profits of each Vessel." Section 28 provides that the "net earnings of any charter operation or other use" of the Vessels and of the funds received by Prudential are to be applied toward the mortgage indebtedness in the fashion provided in the 1983 Financing and Security Agreement.

In *Layne & Bowler Corp. v. United States Shipping Board Emergency Fleet Corp.*, 27 F.2d 39 (9th Cir.1928), it was held that a mortgage granting a security interest in a Vessel and "the earnings, income, revenue, issues and profits of said Vessel" did not convey a security interest in freights but only net income. The right to freights was held to be incidental to the Vessel but could be separately assigned before arrest or before a mortgagee takes possession. *Accord, In re Levy–Mellon Marine*, 61 B.R. 331 (Bankr.W.D.La.1986); *see also, Merchants' Banking Co. v. Cargo of the Afton*, 134 F. 727 (2d Cir.1904), *cert. denied sub. nom. Tomes v. Merchants' Banking Co.*, 196 U.S. 639, 25 S.Ct. 794, 49 L.Ed. 630 (1905); *United States v. Sterling*, 22 F.2d 323 (S.D.N.Y.1927). The various provisions of the First Preferred Mortgage noted above appear to accord with that analysis. There is no specific grant of

freights,[7] an appointment of an attorney-in-fact does not purport to be the grant of a security interest and the right to collect seemingly compliments the right to take possession of the Vessels. While the issue is not free from doubt, the sophisticated nature of these parties and their counsel strongly indicates that these provisions were written against the backdrop of *Layne & Bowler*. In light of that authority, one would think that if a grant of freights and hire was intended, it would have been specifically stated.

Apparently recognizing the strength of this reasoning, Prudential points to the granting clause language referring to the whole of the Vessels and refers to *Gulf Oil Trading Co. v. Creole Supply*, 596 F.2d 515 (2d Cir.1979) and *Morgan Guaranty Trust Co. of New York v. Hellenic Lines Ltd.*, 38 B.R. 987 (S.D.N.Y.1984) where it is stated that freights are incident to a Vessel. But those cases involve, not mortgage liens, but inchoate liens provided by statute which mature upon arrest. They are thus consistent with the *Layne & Bowler* line of cases.

Complicating the Proceeds and Use Dispute, however, is Prudential's motion to vacate the automatic stay so that it could arrest the Vessels and its agreement to permit the charter of three Lancers to Sea Land. These implicate the § 362(d)(1) requirement of adequate protection for Prudential as an undersecured creditor, pursuant to either the disputed First Preferred Mortgage or the undisputed Second Preferred Mortgage. With Prudential having demanded that the automatic stay be vacated against the Vessels, it was entitled to adequate protection by virtue of § 362(d)(1) for their continued use by the Debtors through their being chartered to Sea Land.

#### C. *The 506(c) Dispute*

Section 506(c) of the Bankruptcy Code provides that a debtor-in-possession "may recover from property securing an allowed

---

**7.** Freights include charter hire. *United States v. Robins Drydock & Repair Co.*, 13 F.2d 808, 813 (1st Cir.1926).

secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim." 11 U.S.C. § 506(c); *see* 11 U.S.C. § 1107.

Such expenses are, however, only allowable to the extent that either (a) the secured creditor expressly or impliedly consented to bear them, *General Electric Credit Corp. v. Levin & Weintraub (In re Flagstaff Foodservice Corp.)*, 739 F.2d 73, 77 (2d Cir.1984) ("*Flagstaff I*"); *In re Hotel Associates, Inc.*, 6 B.R. 108, 113–14 (Bankr.E.D.Pa.1980) or (b) they are (i) necessary; (ii) of direct and primary benefit to the secured creditor; and (iii) reasonable. *General Electric Credit Corp. v. Peltz (In re Flagstaff Foodservice Corp.)*, 762 F.2d 10, 12 (2d Cir.1985) ("*Flagstaff II*"); *Matter of Trim–X, Inc.*, 695 F.2d 296, 299 (7th Cir.1982). As the *Flagstaff I* court reasoned, "Congress's express intent in enacting section 506(c) was to ensure that, any time a debtor in possession 'expends money to provide for the reasonable and necessary cost and expenses of preserving or disposing of a secured creditor's collateral, the ... debtor in possession is entitled to recover such expenses from the secured party or from the property securing an allowed secured claim held by such party.' 124 Cong.Rec. H11089 (daily ed. Sept. 28, 1978) (Statement of Rep. Edwards), *reprinted in* 1978 U.S.Code Cong. & Ad. News 5787, 6436, 6451" *Flagstaff I*, 739 F.2d at 76 (ellipsis in original).

Here the 506(c) Dispute has two components: (i) recovery from Prudential of the $1.2 million expended while Vessels were on lay-up in New York and (ii) recovery from other lien creditors of such sums and the allocation thereof between the Debtors and Prudential.

It appears that there is little if any dispute that the sums expended were reasonable and necessary. There is no evidence that Prudential agreed to bear them. The question of whether they were of primary benefit to Prudential is intertwined with the Mortgage Dispute. If the Debtors were to prevail in the Mortgage Dispute and to preserve the remaining $92.78 million of The First Preferred Mortgage for the estate pursuant to 11 U.S.C. § 551, it can hardly be said that the payments were for the primary benefit of the secured creditor Prudential.

Similarly, it is difficult to find a primary benefit to mariners holding priming liens. Their claims are not estimated to exceed 1⁄50 of the sales proceeds from the Vessels. It is not claimed that they consented to bear the expenditures.

In the event that GECC succeeds in limiting the First Preferred Mortgage to $92,-885, it would appear that the allocation is reasonable if the remaining sums ($1.2 million less $450,000) are recovered from GECC. In that event, U.S. Lines will receive a total of roughly $650,000 or half of the sum it expended.

## VI.

In the application of these factors it is therefore plainly apparent that the settlement is not only reasonable but leads to a just result. The novelty of the Mortgage Dispute issues and the strength of Prudential's arguments indicate that the resolution of that dispute, when coupled with the release by Prudential of its weaker claims to all proceeds other than the Sea Land charter hire and its prospective payment of a significant portion of the Debtors' Vessel preservation costs, is reasonable and makes clear that this is a settlement that was negotiated by counsel for the Debtors who achieved a result markedly consistent with a true perception of the issues and the strength of the opposing arguments. Counsel for the creditors committee has apparently made the same analysis.

It may not be that resolution of the Proceeds and Use Dispute is fully justified if analyzed standing by itself and without regard to Prudential's having permitted the chartering of these Lancers to Sea Land. But those charters were part of an arrangement of great benefit to the estate in setting minimum bids for the Lancers and Prudential may have had adequate protection claims.

But the resolution of these disputes is not to be separately weighed. They are

part of an integrated settlement that will afford these Debtors with more than might be reasonably expected with respect to the Mortgage Dispute and provides it a method to recover a good portion of the costs it expended on its Vessels.

To this is to be added the notion that the highly charged nature of the Mortgage Dispute demanded its early resolution so that these estates can proceed to a plan and the costs of their administration eased.

While GECC would apparently prefer that the Debtors take the risk of further litigation, other creditors disagree.

The foregoing constitutes this Court's findings of fact and conclusions of law. In the balance of all the relevant factors, it is clear that the settlement should be and hereby is approved and the Debtors authorized to carry out its terms. It is

SO ORDERED.

DEPARTMENT OF TRANSPORTATION
U.S. COAST GUARD
CG-1332 (Rev. 4-67)

## GENERAL INDEX OR ABSTRACT OF TITLE

514261
Steam Screw

(1) AMERICAN LANCER

The vessel was built at ... Chester, Pa. ............. in 1968 ... d. ... Steel ........
by Sun Shipbuilding and Dry Dock
on appears by ... Certificate of Robert Galloway, Junior Carpenter, of Sun Shipbuilding and Dry Dock Company, on file.

| GRANTOR | GRANTEE | Kind of instrument and interest port conveyed | Date of instrument and date of maturity | Consideration or choose amount | Received for record | Recorded | Time of endorsement and entry upon index of home port | Port where endorsed |
|---|---|---|---|---|---|---|---|---|
| United States Lines, Inc. | The Chase Manhattan Bank (National Association) Trustee for Bondholders | First Preferred Mortgage | Mar. 18,1970 | $101,600,000.00 | March 18,1970 | Book PM 250 | March 18, 1970 at 5:30 P.M. | New York, N.Y. |
| United States Lines, Inc. | The Prudential Insurance Company of America | Whole First Preferred Mortgage Whole and 10 others | 12 Apr.1978 | $101,600,000.00 | at 3:30 P.M. | Page 29 | | |
| | | | 31 Apr.1993 | | 12 April 1978 at 10:03 a.m. | Book PM 331 Page 2 | 20 APRIL 1978 at 9:00 a.m. PST at 12:05 p.m.EDT | San Francisco Calif. |
| The Chase Manhattan Bank (National Association), Trustee for Bondholders | United States Lines, Inc. | Satisfaction of 1st Preferred Mortgage | 31 Apr.1978 | $5,600,000.00 | 12 April 1978 at 2:02 p.m. | Book PM 331 Page 23 | 20 APRIL 1978 | San Francisco Calif. |
| NOTE: Above Satisfaction refers to the First Preferred Mortgage recorded 18 March 1970 in Book PM 250, Page 29. | | | | | | | 20 April 1978 | |
| • • • | • • • | | • • | | • • • | • • • | • • • | • • • |
| United States Lines, Inc. | The Prudential Insurance Company of America | Amendment #1 to 1st Pref'd Whole and 10 others | 31 Aug.1978 | | 20 Aug. 1978 at 2:31 p.m. | Book PM 333 Page 35 | 8 SEPTEMBER 1978 at 9:25 P.M. 8 SEPTEMBER 1978 | NEW YORK, N.Y. |
| The Prudential Insurance Company of America | United States Lines, Inc. (BOOK PM 331, PAGE 2) | Whole First Pref'd First Pref. Mtge. | 21 Apr.1983 | | APRIL 21, 1983 at 3:31 P.M. | Book PM 368 | 13JUN83 | NEW YORK, N.Y. |
| United States Lines, Inc. | The Prudential Insurance Company of America | Whole Preferred First Mtge. | Jun 21 1983 | | APRIL 21, 1983 | Page 39 | 13JUN83 AT 12:15 P.M. | NEW YORK, N.Y. |
| United States Lines, Inc. | The Prudential Insurance Company of America | Whole and 15 others | Oct 15 1983 | | at 3:34 P.M. | Page 41 | 13JUN83 AT 12:11 P.M. | NEW YORK, N.Y. |
| United States Lines, Inc. | United States Trust Company of New York, Trustee | Preferred Mortgage | Jun 21 1983 | | APRIL 21, 1983 at 3:43 P.M. | Book PM 368 Page 59 | 13JUN83 AT 12:20 P.M. | NEW YORK, N.Y. |
| United States Lines, Inc. | United States Trust Company of New York, Trustee | Whole Amendment #1 to P/M | Jul 31 1998 | | | Page 59 | 13JUN83 AT 12:11 P.M. | |
| United States Lines, Inc. | The Prudential Insurance Company of America | Whole Amendment #1 to 1st P/M | 14 Apr 1986 | Reduced to $102,544. | 15 April 1986 | Book PM 419 | 27 MAY 1986 AT 11:43 A.M. | NEW YORK, NY |
| United States Lines, Inc. | The Prudential Insurance Company of America | Whole and 7 others Whole and entire amount | 13 OCT 1993 | Reduced to $62,485.00 | 15 April 1986 at 5:04 P.M. | Page 103 | 27 MAY 1986 AT 11:50 A.M. | NEW YORK, NY |

PLAINTIFF'S EXHIBIT

| DEPARTMENT OF TRANSPORTATION U.S. COAST GUARD CG-133'' (REV. 5-82) | CERTIFICATE OF OWNERSHIP OF VESSEL | OMB APPROVED 2115-0110 |
|---|---|---|

**1. VESSEL**

| A. NAME OF VESSEL | B. OFFICIAL NUMBER | C. HOME PORT |
|---|---|---|
| AMERICAN LANCER | 514261 | NEW YORK, N. Y. |

**2. OWNERSHIP CERTIFICATION**

I HEREBY CERTIFY THAT THE ABOVE-NAMED VESSEL BEARING THE OFFICIAL NUMBER INDICATED, IS OWNED AS FOLLOWS:

UNITED STATES LINES, INC.

27 Commerce Drive

Cranford, New Jersey 07016

**3. ENCUMBRANCES**

AND THAT THE FOLLOWING MORTGAGES, LIENS, OR OTHER ENCUMBRANCES ARE ON RECORD AT THIS OFFICE:

A. KIND OF ENCUMBRANCE:

FIRST PREFERRED FLEET MORTGAGE

| (1) GRANTOR | (2) GRANTEE | (3) DATE OF INSTRUMENT |
|---|---|---|
| UNITED STATES LINES, INC. | THE PRUDENTIAL INSURANCE COMPANY OF AMERICA | 21 APRIL 1983 |
| | | (4) AMOUNT $126,859,753.54 & int. & perf. of mtge. covenants |
| | | (5) MATURITY DATE 15 OCTOBER 1991 |

| 6. RECORDATION DATA | (a) DATE 21 APR 1983 | (b) TIME 3:34 P. M. | (c) BOOK PM 368 | (d) PAGE 41 |
|---|---|---|---|---|
| 7. ENDORSEMENT DATA | (a) DATE 13 JUN 1983 | (b) TIME 12:15 P. M. | (c) PORT NEW YORK, N. Y. | |

B. KIND OF ENCUMBRANCE:

PREFERRED MORTGAGE

| (1) GRANTOR | (2) GRANTEE | (3) DATE OF INSTRUMENT |
|---|---|---|
| UNITED STATES LINES, INC. | UNITED STATES TRUST COMPANY OF NEW YORK, TRUSTEE | 21 APRIL 1983 |
| | | (4) AMOUNT $114,000,000.00 & int. & perf. of mtge. covenants |
| | | (5) MATURITY DATE 31 JULY 1998 |

| 6. RECORDATION DATA | (a) DATE 21 APR 1983 | (b) TIME 3:43 P. M. | (c) BOOK PM 368 | (d) PAGE 50 |
|---|---|---|---|---|
| 7. ENDORSEMENT DATA | (a) DATE 13 JUN 1983 | (b) TIME 12:20 P. M. | (c) PORT NEW YORK, N. Y. | |

C. KIND OF ENCUMBRANCE:

AMENDMENT NO. 1 TO PREFERRED MORTGAGE

| (1) GRANTOR | (2) GRANTEE | (3) DATE OF INSTRUMENT |
|---|---|---|
| UNITED STATES LINES, INC. | UNITED STATES TRUST COMPANY OF NEW YORK, TRUSTEE | 14 APRIL 1986 |
| | | (4) AMOUNT Increased to $114,502,564.00 & int. & perf. of mtge. covenants |
| | | (5) MATURITY DATE Changed to 18 SEPTEMBER 1997 |

| 6. RECORDATION DATA | (a) DATE 15 APR 1986 | (b) TIME 5:02 P. M. | (c) BOOK PM 419 | (d) PAGE 101 |
|---|---|---|---|---|
| 7. ENDORSEMENT DATA | (a) DATE 27 MAY 1986 | (b) TIME 11:45 A. M. | (c) PORT NEW YORK, N. Y. | |

PAGE 1:

| ISSUED: | DATE | TIME |
|---|---|---|

SEAL

DOCUMENTATION OFFICER

PLAINTIFF'S EXHIBIT 19d

| DEPARTMENT OF TRANSPORTATION U.S. COAST GUARD CG-1330 (REV. 5-82) | CERTIFICATE OF OWNERSHIP OF VESSEL | OMB APPROVED 2115-0110 |
|---|---|---|

**1. VESSEL**

| A. NAME OF VESSEL | B. OFFICIAL NUMBER | C. HOME PORT |
|---|---|---|
| AMERICAN LANCER | 514261 | NEW YORK, N. Y. |

**2. OWNERSHIP CERTIFICATION**

I HEREBY CERTIFY THAT THE ABOVE-NAMED VESSEL BEARING THE OFFICIAL NUMBER INDICATED, IS OWNED AS FOLLOWS:

UNITED STATES LINES, INC.

27 Commerce Drive

Cranford, New Jersey 07016

**3. ENCUMBRANCES**

AND THAT THE FOLLOWING MORTGAGES, LIENS, OR OTHER ENCUMBRANCES ARE ON RECORD AT THIS OFFICE:

A. KIND OF ENCUMBRANCE:

AMENDMENT NO. 1 TO FIRST PREFERRED FLEET MORTGAGE

| (1) GRANTOR UNITED STATES LINES, INC. | (2) GRANTEE THE PRUDENTIAL INSURANCE COMPANY OF AMERICA | (3) DATE OF INSTRUMENT 14 APRIL 1986 |
|---|---|---|
| | | (4) AMOUNT Reduced to $92,885.00 & int. & perf. of mtge. covenants |
| | | (5) MATURITY DATE 15 OCTOBER 1991 |

| 6. RECORDATION DATA | (a) DATE 15 APR 1986 | (b) TIME 5:04 P. M. | (c) BOOK PM 419 | (d) PAGE 103 |
|---|---|---|---|---|
| 7. ENDORSEMENT DATA | (a) DATE 27 MAY 1986 | (b) TIME 11:50 A. M. | (c) PORT NEW YORK, N. Y. | |

B. KIND OF ENCUMBRANCE:

NOTICE OF CLAIM OF LIEN

| (1) GRANTOR | (2) GRANTEE I.T.O. Corporation of Baltimore | (3) DATE OF INSTRUMENT 19 December 1986 |
|---|---|---|
| | | (4) AMOUNT $97,394.00 |
| | | (5) MATURITY DATE ---------- |

| 6. RECORDATION DATA | (a) DATE 26 Jan 1987 | (b) TIME 5:45 p.m. | (c) BOOK C | (d) PAGE 61 |
|---|---|---|---|---|
| 7. ENDORSEMENT DATA | (a) DATE | (b) TIME | (c) PORT | |

C. KIND OF ENCUMBRANCE:

NOTICE OF CLAIM OF LIEN

| (1) GRANTOR | (2) GRANTEE I.T.O. Corporation | (3) DATE OF INSTRUMENT 19 December 1986 |
|---|---|---|
| | | (4) AMOUNT $2,505.00 |
| | | (5) MATURITY DATE ---------- |

| 6. RECORDATION DATA | (a) DATE 26 Jan 1987 | (b) TIME 5:50 p.m. | (c) BOOK C | (d) PAGE 62 |
|---|---|---|---|---|
| 7. ENDORSEMENT DATA | (a) DATE | (b) TIME | (c) PORT | |

PAGE 2:

| ISSUED: | DATE | TIME |
|---|---|---|

SEAL

DOCUMENTATION OFFICER

| DEPARTMENT OF TRANSPORTATION U.S. COAST GUARD CG-1270 (REV. 5-82) | CERTIFICATE OF DOCUMENTATION | | OMB APPROVED 2115-0110 |
|---|---|---|---|

**1. VESSEL NAME**
AMERICAN LANCER

**14. PROPULSION**
YES

**15. HULL MATERIAL**
STEEL

**2. OFFICIAL NUMBER**
514261

**3. TONNAGE**
GROSS 19046   NET 13544   L. B. D.
674.20/88.8/42.0

**16. TRADE ENDORSEMENTS. DO NOT INSERT ANY TRADES FROM WHICH VESSEL IS RESTRICTED. SEE BLOCK 8.**

THIS VESSEL IS PRESENTLY DOCUMENTED FOR:
COASTWISE
REGISTRY

THIS VESSEL IS PRESENTLY DOCUMENTED FOR:

**4. HOME PORT**
NEW YORK, N. Y.

**5. BUILD: PLACE(S)**   YEAR
ENNSYLVANIA - 1968

DATE 16 AUGUST 1982
SIGNATURE

DATE
SIGNATURE

**6. OWNER**
UNITED STATES LINES, INC.

THIS VESSEL IS PRESENTLY DOCUMENTED FOR:

THIS VESSEL IS PRESENTLY DOCUMENTED FOR:

**7. OWNER'S ADDRESS**
27 COMMERCE DRIVE
CRANFORD, N. J. 07016

**8. RESTRICTIONS**

DATE
SIGNATURE

DATE
SIGNATURE

**9. ENTITLEMENTS**
NONE

THIS VESSEL IS PRESENTLY DOCUMENTED FOR:

THIS VESSEL IS PRESENTLY DOCUMENTED FOR:

**10. PORT OF ISSUANCE**
NEW YORK, N. Y.

PLAINTIFF'S EXHIBIT 18 d

SIGNATURE & SEAL
EDWARD F. LORENTZ
DOCUMENTATION OFFICER
514261

AUG 1986

DATE
SIGNATURE

DATE
SIGNATURE

*INDICATES CHANGE IN ITEM. NATURE OF WHICH IS REFLECTED ON REVERSE OF DOCUMENT.

## PREFERRED MORTGAGE ENDORSEMENTS

| MORTGAGE ENDORSEMENT | | MORTGAGE AMENDMENTS |
|---|---|---|
| **INSTRUMENT** PM 331, INST. 2 ** | **INSTRUMENT** PM 368, INST. 41 ** | **1. INSTRUMENT AMENDED** PM 331, INST. 2 CHANGE Certain nonrecordable elements have been amended. |
| **MORTGAGOR** UNITED STATES LINES, INC. | **MORTGAGOR** UNITED STATES LINES, INC. | **DATE AND TIME OF ENDORSEMENT** 8 SEPTEMBER 1978 AT 9:25 P.M. |
| **MORTGAGEE** THE PRUDENTIAL INSURANCE COMPANY OF AMERICA | **MORTGAGEE** THE PRUDENTIAL INSURANCE COMPANY OF AMERICA | SIGNATURE AND SEAL /s/A. Velez |
| **AMOUNT** $101,800,000.00 & inter. & perf. of mtge. covenants | **AMOUNT** $126,859,753.54 & INT. & POMC | PORT NEW YORK, N. Y. |
| **MATURITY DATE** 15 APRIL 1993 | **MATURITY DATE** 15 OCTOBER 1991 | **2. INSTRUMENT AMENDED** PM 368, INST. 50 CHANGE Amount increased to $114,502,564.00 & int. & pomc; Maturity Date Changed to 18 SEPTEMBER 1997 |
| **DATE AND TIME OF ENDORSEMENT** APRIL 20, 1978 AT 9:00 A. M. PST | **DATE AND TIME OF ENDORSEMENT** 13 JUNE 1983 AT 12:15 P. M. | **DATE AND TIME OF ENDORSEMENT** 27 MAY 1986 AT 11:45 A. M. |
| **SEPARATE DISCHARGE (IF ANY)** SEPARATE DISCHARGE, .01% OF TOTAL AMOUNT. | **SEPARATE DISCHARGE (IF ANY)** | PORT NEW YORK, N. Y. |
| **SIGNATURE AND SEAL** /s/F. K. Oda | **SIGNATURE AND SEAL** EDWARD F. LORENTZ | **3. INSTRUMENT AMENDED** PM 368, INST. 41 CHANGE Amount reduced to $92,885.00 & int. & pomc |
| **PORT** SAN FRANCISCO, CALIFORNIA | **PORT** NEW YORK, N. Y. | **DATE AND TIME OF ENDORSEMENT** 27 MAY 1986 AT 11:50 A. M. |
| **SATISFACTION** SATISFIED BY PM 368, INST. 39, FILED AT N. Y., NY | **SATISFACTION** SATISFIED BY PM, INST., FILED AT | SIGNATURE AND SEAL |
| **DATE OF ENTRY** 13 JUNE 1983 | **DATE OF ENTRY** | |