In re CROWTHERS McCALL PATTERN, INC. d/b/a The McCall Pattern Company, Debtor.

Bankruptcy No. 88B–12659 (HCB).

United States Bankruptcy Court, S.D. New York.

Oct. 12, 1990.
As Corrected Oct. 22, 1990.

**282**

Stroock & Stroock & Lavan by Robin Keller, Eli Levitan, Bruce Gitlin, New York City, for debtor.

Skadden Arps Slate Meagher & Flom by Michael L. Cook, Brad Axelrod, New York City, for Creditors Committee.

Paul Weiss Rifkind Wharton & Garrison by Robert L. Laufer, Jeffrey K. Cymbler, New York City, for Reginald F. Lewis.

### DECISION AND ORDER

HOWARD C. BUSCHMAN III, Bankruptcy Judge.

Before the Court is the question of confirmation of the Second Amended and Re-

stated Joint Plan of Reorganization (the "Plan") proposed by the Debtor and Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1129 of the Bankruptcy Code (the "Code"), 11 U.S.C. § 1129.

### I.

The Debtor manufactures and sells, largely through dealer-distributors, home sewing patterns for women's, men's, and children's garments and "soft" crafts. Tr. 27.[1] Although the market has declined somewhat since 1976, the Debtor's share has grown to 35.7%. It has two principal competitors in the United States and limited competition from abroad. Tr. 9–20. The financial arrangement upon which the Plan is premised is described in this Court's decision reported at 114 B.R. 877, 20 Bankr.Ct.Dec. 1012 (Bankr.S.D.N.Y.1990), familiarity with which is assumed.

Briefly, the Debtor was extensively marketed for over two years. After being actively shopped for a year with no results, a non-judicial auction of the Debtor was held in August 1989 but negotiations with the winning bidder broke down in September 1989. A judicial auction held on October 19, 1989 aborted for reasons that are still the subject of litigation. Another marketing effort was more successful: the Debtor entered into a merger agreement with Dimeling & Schreiber, the highest bidder, upon which the Plan is founded. Pursuant to the merger agreement, an entity formed by Dimeling & Schreiber, known as McCall Acquisition Co. ("Acquisition") will be merged with and into the Debtor, which will continue as the surviving corporation under the name "The McCall Pattern Company." Outstanding preferred and common stock issued by the Debtor is to be cancelled. Acquisition will pay $45,000,000 in cash, plus a purchase price adjustment of approximately $2.16 million, thereby partially funding the Plan. McCall Pattern

---

1. References to "H." are to the transcript of the hearing of September 17; references to "Tr." are to the deposition transcript of the continued testimony of the author of the Disclosure State-

ment, John Kobiskie; references to "Tr. Erickson" are to the to the transcript of the deposition of John Erickson.

will assume and pay certain pre-petition liabilities incurred in the ordinary course of business in the amount of $2.837 million and all outstanding post-petition administrative claims ($22.344 million) subject to a limit on professional fees.[2] Second Amended Joint Disclosure Statement ("Discl. Stmt,") p. 4, Ex. 4, p. 4–4 n. (a).

The remaining creditors consist of: (i) current and former officers and directors who have asserted indemnification claims; (ii) the Travelers Insurance Company and Travelers Indemnity Company (jointly "Travelers") which assert a claim of some $42.8 million pursuant to so-called Senior Notes; (iii) debentureholders are owed some $21.8 million in principal amount with respect to debentures issued in 1985 (the "Debentures"); and (v) John Crowther Group PLC ("Crowther"), owed some $7.5 million with respect to the junior subordinated notes issued June 30 and December 31, 1987 ("Junior Notes"). The indemnification claims are to be paid in full to the extent allowed. Appropriate reserves will be established for disputed claims, for $4 million of indemnification claims and for any price adjustment owed under the merger agreement.

Once those reserves are established, the remaining merger proceeds will be distributed to Travelers, the holder of Class 5 claims ("Senior Note" claims) and to Class 6 claims pursuant to a formula agreed to in a settlement between Travelers and the Debtor and contained in the Plan. Pursuant to the formula, Debentureholders are allocated $12.5 million of the merger proceeds subject to their share of the reserves. At least $800,000 otherwise distributable to Class 5 claims and at least $1 million otherwise distributable to Class 6 claims will be reserved to fund extant litigation separately brought on behalf of the Debtor by Travelers and by United States Trust Company ("U.S. Trust") as indenture trustee against former directors, officers and shareholders of the Debtor and others concerning pre-petition transactions with the Debtor.

The Plan provides that the Debtor is deemed to have transferred to the trustee of a liquidating trust on behalf of and for the benefit of creditors and shareholders, control of and all of the Debtor's right, title and interest in those litigations. Section 4.1 states, in relevant part:

As of the Effective Date ... (ii) McCall shall be deemed to have assigned, transferred, conveyed and delivered to the Trustee, on behalf of and for the benefit of the Beneficiaries, control of, and all of McCall's right, title and interest in, and to the proceeds from, the Previous Transaction Litigation and (iii) pursuant to the Liquidating Trust Agreement, the Trustee shall accept the rights and properties assigned and transferred to it and the trust imposed upon it, agree to retain and enforce the Federal Litigation on behalf of and for the benefit of the Beneficiaries, further agree to be appointed for such purpose under section 1123(b)(3)(B) of the Bankruptcy Code and hold the proceeds and all other amounts that may be delivered to it from time to time in trust for the Beneficiaries.

Plan, p. 10. Travelers, similarly, is to assign to the trustee, for the benefit of creditors and shareholders, the proceeds of its litigation.[3]

Amounts received by the liquidating trust are to be distributed after payment of expenses, by allocating, as set forth in the Plan and contemplated by the settlement

**2.** An exhibit to the merger agreement reflects $3,620,000 of assumable pre-petition claims. The sum of $2.837 million stated in the Disclosure Statement is presumed to reflect an updated and more correct figure.

**3.** Debentureholders chose between two forms of treatment under the Plan. Holders choosing Option A are deemed to assign their share of the proceeds of the various litigations to the Trustee and to have released Travelers from certain claims. Holders choosing Option B are not deemed to have assigned their share of the proceeds of the U.S. Trust litigation or to have released Travelers. All Debentureholders who made an election opted for Option A. Those Debentureholders who made no election are deemed to have elected Option B. The Indenture Trustee, solely on behalf of those Debentureholders electing Option A, will assign to the trustee, for the benefit of creditors, the proceeds of the U.S. Trust litigation. Discl.Stmt, p. 15.

between the Debtor and Travelers: (i) the first $7 million to electing Class 6 claimholders; (ii) of the next $2 million, 40% to holders of Class 5 claims and 60% to electing Class 6 claimholders; (iii) additional amounts to holders of Class 5 claims until Class 5 claims are fully satisfied, including post-petition interest; (iv) additional amounts to electing Class 6 claimholders until such claims are fully satisfied, including post-petition interest; (v) additional amounts to holders of Class 6 claims electing Option B until such claims are completely satisfied, including post-petition interest; and (vi) additional amounts to the holders of claims based on the Junior Notes (Class 7) until such claims are completely satisfied, including post-petition interest. Further amounts are to be distributed as follows: (a) the first $20 million to persons who held, immediately prior to confirmation, former preferred shares issued by the Debtor; (b) the next $20 million to persons who held former common shares immediately prior to confirmation; and (c) any additional amounts to be distributed pro rata to persons who hold preferred shares and common shares immediately prior to confirmation, provided that in no event shall the holders of preferred shares be entitled to distributions in amounts exceeding $10 per share.

Reginald F. Lewis, a holder of common stock, objects to confirmation of the Plan. He contends: (i) that the Debtor's assignment of its litigation claims against former officers, directors, shareholders and others violates section 1123(b)(3)(B) of the Code; (ii) that the Travelers settlement may not be approved in the absence of an adequate factual basis; (iii) that dissenting creditors and shareholders would receive more in liquidation than under the Plan and, therefore, the Plan does not meet the "best interests of creditors" test contained in sec-

tion 1129(a)(7) of the Code, and is not "fair and equitable" as required by section 1129(b)(1) of the Code; and (iv) that the liquidation analysis contained in the Disclosure Statement is erroneous to the degree that it cannot now be said that it contained adequate information under section 1125 of the Code and thus the Debtor has not complied with the Code as required by section 1129(a)(2).

At the hearings on confirmation held on September 17 and 27, 1990,[4] there was no dispute, and the submissions showed, that the other requisites of section 1129(a) have been satisfied. The Plan has been overwhelmingly accepted by 100% of those creditors and preferred shareholders exercising their right to vote. Holders of $523,250 of debentures did not vote, however. Common shareholders have not accepted the Plan. We turn, therefore, to consideration of the three issues raised by Lewis and which the Court has the independent duty to examine.[5] *See, e.g., Williams v. Hibernia Nat'l Bank (In re Williams)*, 850 F.2d 250, 253, Bankr.L.Rep. (CCH) ¶ 72,418 (5th Cir.1988); *In re Rusty Jones, Inc.*, 110 B.R. 362, 373, 20 Bankr.Ct.Dec. 159 (Bankr. N.D.Ill.1990). On these issues, the plan proponents bear the burden of proof.

## II.

■ Section 1123(b)(3)(B) of the Code provides:

> [A] plan may ... (3) provide for ... (B) the retention and enforcement by the debtor, by the trustee or a representative of the estate appointed for such purpose of any ... claim or interest [belonging to the debtor or to the estate].

Lewis contends that section 4.1 of the Plan, in providing that the Debtor is "deemed to have assigned, transferred, conveyed and delivered to the Trustee" all of its right,

---

4. At the hearing on September 17, 1990, it became apparent that considerable additional testimony was contemplated and that the Court's calendar would not permit resumption of the hearing until September 27. The parties, therefore, agreed with the Court's suggestion that cross-examination of the author of the Disclosure Statement and further examination of witnesses be conducted at deposition. At the re-

sumption of the hearing on September 27, the depositions were submitted without objection and oral argument was entertained.

5. Although the parties debate Lewis' standing to raise some of these issues, we need not address that question in light of the Court's independent duty.

title and interest to litigation against Lewis and others violates this section as an impermissible assignment. This contention is without merit.

Although it was repeatedly held under the former Bankruptcy Act that a trustee could not assign avoidance claims, e.g., preference claims, because only the estate as a whole could benefit from avoidance, 3 L. King, F. Hart, A. Herzog & S. Lowe, *Collier on Bankruptcy* ¶ 60.57[2] (14th ed. 1977); *see also Texas Consumer Fin. Corp. v. First Nat'l City Bank*, 365 F.Supp. 427, 430 (S.D.N.Y.1973) and cases cited therein, section 1123(b)(3)(B) has been repeatedly interpreted to permit assignments to a trustee or other representative provided:

> a successful recovery by the appointed representative would benefit the debtor's estate and particularly, the debtor's unsecured creditors.

*Temex Energy Inc. v. Hastie & Kirschner (In re Amarex, Inc.)*, 96 B.R. 330, 334, 18 Bankr.Ct.Dec. 1477 (W.D.Okla.1989); *see also, Citicorp Acceptance Co., Inc. v. Robison (In re Sweetwater)*, 884 F.2d 1323, 1327, 21 Collier Bankr.Cas.2d 1034, 19 Bankr.Ct.Dec. 1232, Bankr.L.Rep. (CCH) ¶ 73,093 (10th Cir.1989); *Kroh Bros. Dev. Co. v. United Missouri Bank of Kansas City (In re Kroh Bros. Dev. Co.)*, 100 B.R.

487, 495–97, 19 Bankr.Ct.Dec. 234 (Bankr. W.D.Mo.1989); *Southern Commodity Corp. Official Liquidating Committee v. El Campo Rice Mill Co. Inc. (In re Southern Commodity Corp.)*, 78 B.R. 626, 627 (Bankr.S.D.Fla.1987). In this, the courts have examined whether the assignment is for the sole benefit of a stranger to the estate as assignee or is for the benefit of parties in interest to the estate. They thus distinguish a traditional unequivocal assignment from a transfer to a representative of parties in interest. *Sweetwater*, 884 F.2d at 1327; *Amarex* 96 B.R. at 334.[6]

Here, there is no dispute that the trustee will be appointed if the plan is confirmed. *Sweetwater*, 884 F.2d at 1326. Nor is there any dispute that the proceeds, if any, of the assigned claims will redound to the benefit of unsecured creditors and, if sufficient, to shareholders.[7] *Id.; Amarex*, 96 B.R. at 334. The assignment thus lies within section 1123(b)(3)(B) and is permissible.

### III.

■ The Travelers' settlement, to which we now turn, concerns a claim the Debtor and Committee assert may lie against Travelers in connection with its loan of $35 million to the Debtor in 1987 and the Debt-

---

**6.** Some courts have broadly interpreted the requirement of benefit in cases of debtor retention of avoidance powers and their benefits to include, not only the derivative benefit to creditors receiving stock in the reorganized debtor, *Duvoisin v. East Tennessee Equity Ltd. (In re Southern Industrial Banking Corp.*, 59 B.R. 638 (Bankr.E.D.Tenn.1986), but also an increase in the probability of a successful reorganization through making a payment to a post-petition lender. *Tennessee Wheel & Rubber Co. v. Captron Corp. Air Fleet (In re Tennessee Wheel & Rubber Co.)*, 64 B.R. 721, 725–26, 15 Collier Bankr.Cas.2d 882, 14 Bankr.Ct.Dec. 1166 (Bankr.M.D.Tenn 1986), *aff'd*, 75 B.R. 1 (M.D. Tenn.1987).

Moreover, the notion that assignment of estate property must be for the benefit of parties in interest ties in to the mandate of section 1123(a)(5). That section provides that the plan must provide adequate means of implementation of the plan, including "transfer of all or any part of the property of the estate to one or more entities, whether organized before or after the confirmation of such plan." 11 U.S.C.

§ 1123(a)(5)(B). That this broad language might be limited to sales of estate property to fund the plan, *see* 4 L. King, C. Cyr, H. Minkel, R. Rogers, H. Sommers, W. Taggert & A. Winkler *Collier on Bankruptcy* ¶ 1123.01[5] (15th ed. 1989), is negated by the enactment of section 1123(a)(5)(D) which expressly includes sales as a means of implementation. Section 1123(a)(5)(B) appears clearly to contemplate transfer to an entity such as a liquidating trust organized after confirmation to facilitate distribution to parties in interest in accordance with a plan.

**7.** Whether some of the claims could benefit shareholders we do not decide. *See* 4 L. King, R. D'Agostino, M. Cook, R. Malaey, A. Pedlar, H. Sommer & B. Zaretsky, *Collier on Bankruptcy* ¶ 544.03 (15th ed. 1989) (recovery on claims brought pursuant to § 544(b) is for the benefit of the estate and all its unsecured creditors). This rule adopts the holding of *Moore v. Bay*, 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133 (1931). *Moore v. Bay* has not been extended to provide for recovery benefitting shareholders.

or's issuance, in return, of the Senior Notes evidencing the obligation.

## A.

From the disclosure statement and a complaint filed by the Committee against Lewis and others on behalf of the Debtor, it appears that GJS One Acquisition Inc., on June 30, 1987, directly and indirectly, purchased all of the outstanding stock of TLC Pattern, Inc., a predecessor to the Debtor, from Lewis and others in exchange for $63 million ("GJS Acquisition"). GJS itself was owned 50% by a Crowther subsidiary, 30% by an affiliate of Shearson American Express Company, Inc. ("Shearson") and 20% by Lewis. Included in the financing for the GJS Acquisition were loans by Bankers Trust Company, $15 million, and a Shearson affiliate, $20 million. On September 24 and 25, 1987, the parent of TLC Pattern and TLC Pattern itself were merged unto GJS, forming Crowthers McCall Pattern, Inc., the Debtor.

Travelers loaned $35 million to the Debtor on September 30, 1987, receiving the Senior Notes in exchange. The loan proceeds were used to pay off the loans made by Bankers Trust and the Shearson affiliate to finance the GJS Acquisition.

The Senior Notes are not by their terms contractually subordinate to other debt. The Debentures, issued in 1985 by TLC Pattern and assumed by the Debtor in 1987 are subordinate to senior indebtedness such as the Senior Notes. The Junior Notes held by Crowther are subordinate to both the Senior Notes and the Debentures.

By order dated April 13, 1989, the Court approved a stipulation between the Debtor and the Committee permitting the Committee to, inter alia, investigate and prosecute, on the Debtor's behalf, causes of action relating to the GJS Acquisition and other prepetition transactions and authorizing the Committee to retain special litigation counsel to conduct such investigation with the assistance of Ernst & Young, the Committee's financial advisors and accountants. The Committee created a special subcommittee comprised of one Debentureholder and one trade creditor. The sub-committee, with the assistance of Pacific Mutual Life Insurance Company, co-chair of the Committee and the largest holder of Debentures, and with the aid of special counsel and accountants, investigated the GJS Acquisition and evaluated claims that the estate might have. See Gritzmacher Affidavit ¶¶ 9 and 10.

In the investigation, special counsel reviewed thousands of pages of documents produced by the various participants in the GJS acquisition. Gottlieb Affidavit ¶ 4. Travelers also produced files and records pertaining to its purchase of the $35 million Senior Notes. Id. Legal issues germane to the GJS Acquisition, including fraudulent conveyance issues and the application of fraudulent conveyance laws to leveraged buyouts, were researched. Gottlieb Affidavit ¶ 7.

Eventually, the Committee sued certain of the Debtor's former shareholders, officers and directors and Bankers Trust and Shearson on behalf of the Debtor, principally alleging that the GJS Acquisition constituted a fraudulent conveyance in violation of N.Y. Debtor and Creditor Law §§ 272–278 (McKinney's 1990). Gottlieb Affidavit ¶ 8, Ex. A.

The Committee did not commence litigation against, but rather began settlement negotiations with, Travelers, Gottlieb Affidavit ¶ 9, ultimately settling the dispute on terms to be incorporated in and form the basis for a consensual plan of reorganization. Pacific Mutual and U.S. Trust, as indenture trustee, negotiated a settlement of the Debentureholders' similar dispute with Travelers on terms also incorporated in the Plan and reflected in those provisions creating two options for Debentureholders and distributing the proceeds of the various litigations.

Pursuant to the settlement of the Debtor's claims against it, Travelers has agreed to the payment in full of trade creditors before payment in full of Travelers' equal-priority claim and to share the merger proceeds with the Debentureholders pursuant to a formula. In exchange, Travelers will receive a release from the Debtor of all claims which the Debtor might have assert-

ed against it, and, solely to the extent of litigation proceeds actually realized, an indemnity from the Debtor from all attempts by Lewis, Shearson, Bankers Trust and others to shift to Travelers their liability arising from the claims the Debtor has asserted against them. Discl. Stmt, pp. 13–16.

## B.

▮ Settlements forming part of a Chapter 11 plan of reorganization may be approved by a bankruptcy court only if "fair and equitable." *Protective Committee v. Anderson*, 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968); *United States v. Aweco, Inc. (In re Aweco, Inc.)*, 725 F.2d 293, 298, 11 Bankr.Ct.Dec. 953, Bankr.L.Rep. (CCH) ¶ 69,722 (5th Cir.), *cert. denied*, 469 U.S. 880, 105 S.Ct. 244, 83 L.Ed.2d 182 (1984); *In re Texaco*, 84 B.R. 889, 901, 18 Collier Bankr.Cas.2d 1099, 17 Bankr.Ct.Dec. 222 (Bankr.S.D.N.Y.1988). In this, the Court must exercise its "informed and independent judgment" against a background of all facts necessary for an "intelligent and objective opinion," *Protective Committee*, 390 U.S. at 424, 88 S.Ct. at 1163, as to:

(a) the probability of success in the litigation;

(b) the difficulties, if any, to be encountered in the matter of collection;

(c) the complexity of the litigation involved, the expense, inconvenience and delay necessarily attending it; and

(d) the paramount interest of the creditors and a proper deference to their reasonable views in the premise.

*E.g., In re Lion Capital Group Inc.*, 49 B.R. 163, 175, 12 Collier Bankr.Cas.2d 1031 (Bankr.S.D.N.Y.1985) (citing *Drexel v. Loomis*, 35 F.2d 800, 806 (8th Cir.1929)). At a hearing on confirmation, the Court has an independent duty to examine settlements incorporated in a plan even where the creditors and other parties in interest are silent. *Aweco*, 725 F.2d at 299; *Texaco*, 84 B.R. at 901. Nevertheless, the bankruptcy courts have discretion to approve a settlement above the lowest level of reasonableness. *Anaconda–Ericsson, Inc. v.*

*Hessen (In re Teltronics Serv., Inc.)*, 762 F.2d 185, 189, 12 Collier Bankr.Cas.2d 899, Bankr.L.Rep. (CCH) ¶ 70,345 (2d Cir.1985) (citations omitted); *Lion Capital*, 49 B.R. at 175. Approval at that level is not required. The Court should be persuaded that the settlement achieves a just result. *Lion Capital*, 49 B.R. at 176.

## C.

With regard to probability of success, the first of these factors, the affidavit of special counsel to the Committee asserts that there is a "sound basis" for claims to avoid Senior Notes as a fraudulent transfer provided that the GJS Acquisition is shown to be fraudulent and the incurrence of the Senior Notes obligation can be collapsed into the acquisition. Gottlieb Affidavit ¶ 9. He adds that the Debtor has "viable causes of action" against Lewis and others in fraudulent conveyance in connection with, *inter alia*, the GJS Acquisition. *Id.* ¶ 8. He avers that to collapse the transaction, the Committee will have to overcome the apparently uncontested facts that Travelers was not approached after the GJS Acquisition and had no role in structuring it. *Id.* ¶ 12.

Travelers vigorously asserts that its loan and acquisition of the Senior Notes were a transaction separate and distinct from the GJS acquisition. Mem. ¶¶ 3, 6, and thus not part of a "step" transaction resulting in a fraudulent conveyance. *See Weiboldt Stores, Inc. v. Schottenstein*, 94 B.R. 488, 20 Collier Bankr.Cas.2d 776, 18 Bankr.Ct. Dec. 1134, Bankr.L.Rep. (CCH) ¶ 72,574 (N.D.Ill.1988). It further asserts that the Senior Notes were fully supported by Travelers' loan of $35 million to the Debtor. That cash was used to retire pre-existing debt of a shorter maturity and higher interest rate. Mem. ¶ 6.

Rather than evaluating the probability of success of the claims against Travelers on this sparse record in light of extant authority, the Debtor, Committee, and Travelers justify the settlement in terms of the results achieved in light of the remedy that would likely be ordered were the Debtor to prevail in its claims. They contend that, at

most, Travelers would be subordinated to the Debentureholders.

It is settled that even were the obligation avoided, that avoidance would be only for the benefit of creditors and the obligation would still stand ahead of equity. Since the transaction preceded the filing of the bankruptcy petition by more than a year, section 548 of the Code would not apply and the claim could be brought by the estate under state fraudulent conveyance law through section 544(b). As noted, however, a transaction can be avoided under section 544(b) only to the extent the avoidance benefits unsecured creditors. 4 L. King, R. D'Agostino, M. Cook, Maley, A. Pedlar, H. Sommers & B. Zaretsky, *Collier on Bankruptcy*, ¶ 544.03 (15th ed. 1989). Where consideration was given, the debt remains in that amount. *See Whiteford Plastics Co. v. Chase Nat'l Bank,* 179 F.2d 582, 584 (2d Cir.1950) (debtor cannot void transaction if no benefit to creditors would result, the deal stands as between the original parties); *National Radiator Corp. v. Parad,* 297 Mass. 314, 8 N.E.2d 794, 796–97 (1937) (transferee of fraudulent conveyance retains claim in amount leftover after creditors are paid; the transfer is valid as between the parties); 37 Am.Jur.2d *Fraudulent Conveyances* § 111 (1968); *cf. Yellowhouse Machinery Co. v. Mack (In re Hughes),* 704 F.2d 820, 822, 10 Bankr.Ct. Dec. 693, Bankr.L.Rep. (CCH) ¶ 69,189 (5th Cir.1983). The remedy in these circumstances is, therefore, equitable subordination. *See United States v. Tabor Court Realty Corp.,* 803 F.2d 1288 (3d Cir.1986), *cert. denied,* 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987).[8]

Accordingly, it is argued that the settlement is reasonable in that Travelers has partially waived its subordination rights as against the Debentureholders and partially subordinated its claim to a portion of the claim of the Debentureholders. Under the Plan, the Debentureholders will receive $12.5 million (less a reserve) from approximately $47.16 million of merger proceeds

instead of the $4.36 million they would receive from those proceeds were the Travelers' claim of $42.8 million accorded full priority. They thus receive over 50% of their total claim from the merger proceeds and preserve their claims for further recovery through litigation.

Special Counsel argues that this fine result is justified because it enabled agreement on a consensual plan without litigation and achieves an early distribution. Gottlieb Affidavit ¶ 25. It is urged that the Debentureholders "gave up nothing" because they retain their claims and have a chance of satisfying them through recovery in the litigation against Lewis *et al. Id.* That assertion, however, ignores that, if the Debtor were to prevail, full subordination of Travelers would enable the Debentureholders to be paid in full from the merger proceeds.

Nevertheless, Debentureholders holding over 50% of the outstanding Debentures negotiated or accepted the settlement as part of their service on the committee. Lewis, although entitled, as a shareholder, to be heard on this issue under section 1109(b), would not benefit from subordination of Travelers.

In these fairly unique circumstances, it appears that the settlement lies above the lowest level of reasonableness and is just. The recovery of roughly 50%, the need for a quick consensual resolution prior to the development of a full record with discovery and depositions, the resultant lowering of costs, the participation by the largest Debentureholders, the need to formulate a basis for a consensual plan, and the absence of any objection by a Debentureholder all indicate that the settlement is fair and just notwithstanding the parties' failure to present a full assessment of the probable success of the claim.

Moreover, no case has been called to our attention that has awarded recovery against a lender on a fraudulent transfer

---

8. Lewis complains that a proper settlement of the claim against Travelers should provide for reduction in the amount of Travelers' claims. This contention is without merit for the reason

discussed in the text and because settlements may adopt many different structures. This settlement effects a partial subordination.

theory as part of a step transaction where the lender was not involved in the incurrence of the original obligation by the debtor, the proceeds served to pay off existing debt, and the lender did not structure the overall allegedly fraudulent transaction or is not charged with actual intent to harm creditors.

The seminal case in this area is *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir.1986), *cert. denied,* 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987) (*"Gleneagles"*).[9] There the stockholders of a financially distressed corporation sold the business to a buyer who financed the purchase with loans provided by a third party and secured by the principal assets of the overall business. All parties were present at the creation of the transactions and knew that the loan proceeds were intended to buy out the stockholders even though the deal was structured to create the illusion of separation between the purchases and the mortgages. Given these facts, the Third Circuit readily collapsed the transactions and found that the mortgages were part of an intentional attempt to use the debtor's assets for the benefit of its shareholders and at the expense of creditors; thus, liability attached to all parties involved, including the lenders.

In *Wieboldt Stores*, 94 B.R. 488, the district court sharply distinguished participants in an alleged fraudulent transfer leveraged buyout from tendering shareholders who neither participated in the structuring of the financing nor had knowledge of the structure of the transaction. It denied motions to dismiss fraudulent conveyance complaints filed against specified controlling shareholders and the lenders who financed the leveraged buyout but granted the motion of the shareholders. 94 B.R. at 502, 503. When Wieboldt was in financial difficulty and not paying its debts as they matured, a group of controlling shareholders arranged for a leveraged buyout of the stock through an acquisition company set up solely for this purpose. The acquisition company obtained 99% of the outstanding stock of Wieboldt. The buyout was financed by a loan secured by substantially all of Weiboldt's assets, accounts receivables, and its principal store. A portion of the proceeds from the sales of the accounts receivables and the principal store went to pay existing secured claims of lender banks which freed certain assets to be pledged to the buyout lender. Within a year, Wieboldt filed for bankruptcy and sought to void the leveraged buyout. The court refused to dismiss the claim as against the lender because, although it advanced $33 million, it did not give reasonably equivalent value since the majority of the proceeds went to pay shareholders. Like *Gleneagles* and unlike Travelers here, the original lender was involved with the transaction throughout and was aware of the structure of the deal. Indeed, the court focused on the structure of the transaction as an attempt to circumvent fraudulent conveyance laws and as evidence of an intent to hinder, delay, and defraud creditors. With respect to shareholders who did not participate in structuring the transaction, the court was not willing to collapse the transaction because no evidence indicated that the non-insider shareholders were aware that the acquisition encumbered all of the debtor's assets or that the consideration they received for their tendered shares was really property of the debtor. 94 B.R. at 503.

As these cases reflect, the difficulty with the Debtor's alleged claim against Travelers arises from the terms of the Fraudulent Conveyance Act, codified in New York as N.Y. Debtor and Creditor Relation Law §§ 272–278 (McKinney's 1990) ("DCL"). In cases not including actual intent to harm creditors—a seemingly impossible construct in this scenario—the statute precludes relief if substantially equivalent consideration was received in good faith. DCL §§ 272, 273.[10] Here, it is unquestioned

---

9. For a detailed discussion of the complex set of facts involved in *Gleneagles, see* Murdoch, Sartin, and Zadak, *Fraudulent Conveyances and Leveraged Buyouts,* 43 Bus.Law. 1 (1987).

10. Section 272 provides:
   Fair consideration is given for property, or obligation,
   a. When in exchange for such property, or obligation, as a fair equivalent therefor, and

that the Debtor either actually received the full $35 million or received equivalent consideration through the discharge of pre-existing obligations held by Bankers Trust and Shearson. While those obligations may have been voidable, they were, at that time, not void. Only if the transactions were collapsed could that discharge seemingly be ignored. Absent some involvement in the GJS Acquisition and it not being contested that Travelers was not solicited until the acquisition had closed, and even were it shown that Travelers knew that the debts owed Bankers Trust and Shearson were based on loans whose proceeds had been employed to pay shareholders, imposing liability on Travelers would appear to be difficult in light of the distinction drawn in *Weiboldt.* In this light, even the sparse record here contains sufficient indicia that the settlement is hardly excessive, is well within the bounds of reasonableness, and produces a just result. *See In re McLean Ind. Inc.,* 84 B.R. 340, 344–45 (Bankr.S.D.N.Y.1988).

### IV.

The central issues that remain for consideration concern the Disclosure Statement's analysis of whether the Plan provides a return to each non-assenting holder of a claim or equity interest of

> a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under Chapter 7 of this title on such date.

11 U.S.C. § 1129(a)(7)(A)(ii). Two principal issues are raised: (i) whether the preponderance of the evidence shows that the so-called "best interests" standard set forth above has been satisfied; and (ii) whether it now appears that the Disclosure Statement's analysis of this issue was materially erroneous such that it cannot now be said that it contained "adequate information" on this point, as required by section 1125(a)(1) of the Code, and should not have been approved, thereby precluding the Court from finding compliance with the Code as required by Section 1129(a)(2) for confirmation of a plan.

### A.

Consideration of the liquidation best interests test contained in section 1129(a)(7)(A)(ii) entails consideration of subordination issues and the distribution priorities set forth in section 726. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 412–13 (1977) U.S.Code Cong. & Admin.News 1978 pp. 5787, 6368, 6369. The Code's subordination provision, section 510, applies in both Chapter 7 and Chapter 11. If a claim or interest is to be subordinated under Chapter 7, the effect subordination would have is to be considered in analyzing whether the dividend payable to that claim under a plan equals or exceeds the dividends payable through a Chapter 7 liquidation. The issue is of significance here because of the subordination provisions of the indenture and the Junior Notes providing for payment in full of Senior Notes plus interest, like that owed to Travelers, prior to payment of the Debentures or the Junior Notes, and the provision in the Junior Notes providing for prior payment of the Debentures. Although Crowther, the holder of the Junior Notes, has accepted the Plan, not all Debentureholders have accepted. Thus, those few Debentureholders who have not accepted and the holders of common stock who have also not accepted the Plan are entitled to the protection of section 1129(a)(7)(A)(ii).

### B.

With $42.8 million of debt, interest and fees claimed by Travelers, $21.8 million of

---

in good faith, property is conveyed or an antecedent debt is satisfied, or
b. When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property or obligation obtained.
N.Y.Debt. & Cred.L. § 272 (McKinney's 1990). Section 273 further provides:

Every conveyance made and every obligation incurred by a person who is or will be rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation incurred without a fair consideration.
N.Y.Debt. & Cred.L. § 273 (McKinney's 1990).

principal owed to the Debentureholders, $7.5 million in principal owed on the Junior Notes, roughly $25 million of trade debt, accrued expenses and priority claims,[11] it is apparent that at least some $97 million, plus matured interest on the Debentures and Junior Notes, since the debtor would be solvent under this scenario, *see* 11 U.S.C. § 726(a)(5), and plus any liquidation preference enjoyed by holders of preferred stock, must be realized to afford a return to common shareholders. The evidence in this record, described below, fairly shows that in liquidation, no such values would be achieved.

With respect to non-assenting Debentureholders, however, the question is more problematic. The Debtor's Liquidation Analysis, set forth on page 4–4 of Exhibit 4 to the Disclosure Statement, states that in liquidation the Debtor's unencumbered assets are to have an "estimated realizable value" of $35,460,000. Priority and assumed expenses are listed at $26,808,000, leaving $8,652,000 to be distributed to unsecured creditors. Since this sum is less than the amount owed Travelers, the Debentureholders would receive nothing. No value was ascribed by the Disclosure Statement or by the parties at the confirmation hearing to any potential downstream recoveries from the litigation against Lewis and others in this respect so none is given here. Thus, in liquidation, the recoveries of Debentureholders would be largely governed by (i) the question of whether the Travelers' claim is to be subordinated to the claims of Debentureholders, (ii) the full extent of priority claims, (iii) the values obtainable in the liquidation process, and (iv) the effect of the subordination of the Debentures to Travelers Senior Notes.

As to the first of these issues, it does not appear at all likely that the Travelers' claim would be subordinated. The claim against Travelers is, for the reasons set forth in Part III of this opinion, quite weak, depending as it does on collapsing the Travelers' loan and obtaining of the Senior

Notes in return into the GJS Acquisition in which Travelers played no role.

C.

■ Of the $26,808,000 first priority administrative expenses listed in the Disclosure Statement, the most startling is the sum of $3,400,000 for severance pay to be allowed as a post-petition administrative claim. That sum was calculated, on the basis of one week's pay for every year of service up to a maximum of 26 weeks, following *Straus–Duparquet, Inc. v. Local Union No. 3 (In re Straus–Duparquet)*, 386 F.2d 649, 651 (2d Cir.1967). No recognition is given to the unsettled question of whether severance pay claims are to be allowed in full as post-petition claims or allowed as post-petition claims only to the extent of post-petition employment.

Prior to adoption of the Bankruptcy Code in 1978, the Second Circuit and the First and Third Circuits had split on this issue. *Compare Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)*, 536 F.2d 950, 955 (1st Cir.1976) *and In re Public Ledger*, 161 F.2d 762, 768–69 (3d Cir.1947) (severance pay allowed as a post-petition claim only for amounts derived from post-petition employment) *with Straus–Duparquet*, 386 F.2d at 651 (severance pay earned in entirety post-petition when employee is severed post-petition). The Code does not resolve this issue. In *Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 103–04, 14 Collier Bankr.Cas.2d 1075, Bankr.L.Rep. (CCH) ¶ 71,096 (2d Cir.1986), the Second Circuit ruled that an administrative claim for withdrawal liability under an employee pension and benefit plan is to be calculated on the basis of only post-petition work; the remainder is a pre-petition claim. In so ruling, the Court equivocated on the severance pay issue. It opined that cases such as *Straus–Duparquet:*

rest on the basis that severance pay is compensation for the hardship which all employees, regardless of their length of service, suffer when they are terminated

11. Discl.Stmt, Ex. 4, p. 4–4; *see* parts IV–C and F for a discussion of the amount of these claims.

and that it is therefore "earned" when the employees are dismissed. Accordingly it is granted a first priority as a cost of doing business during the bankruptcy proceeding.

789 F.2d at 1041. But the Court added: Indeed, it appears to be the general rule that when severance pay, like vacation pay, represents compensation for the employee's past services it is not an administrative expense entitled to priority.

*Id.* (citations omitted). A court in the Third Circuit has applied the holding of *Public Ledger* under the Code. *In re The Levinson Steel Co.*, 117 B.R. 194, 20 Bankr.Ct. Dec. 1322 (Bankr.W.D.Pa.1990) Given the language of *McFarlin's*, it is imprudent not to give a range of values to the administrative claims reflecting the uncertainty concerning resolution of this issue.

■ Similarly, the Debtor's priority expenses include $700,000 of accrued vacation and sick pay claims. No attempt was made to differentiate pre-petition accrual from post-petition accrual; nor was any attempt made to reflect the $2,000 cap provided by section 507(a)(3) of the Code for priority wage-related claims for the 90 day period prior to bankruptcy. It would appear that some of the total must reflect straight unsubordinated pre-petition claims.

■ These errors may well be counterbalanced by the Debtor's failure, in the Disclosure Statement, to realistically evaluate the cost of liquidation. It estimates $1.064 million or 3% of unencumbered assets as "liquidation fees." Discl.Stmt, Ex. 4, p. 4-4. That sum is roughly equivalent to the maximum trustee's commission permitted by section 326 of the Code. While the sum may be high in that the commission awarded may be somewhat less, liquidation may entail other significant costs. For example, the Debtor entered into a lease for new New York premises post-petition and made significant alterations reflected in its listing of $1.4 million book value of leasehold improvements. The liability for non-performance of that lease is a post-petition claim priming unsecured creditors, is not capped by the Code, and would be mitigated by the landlord's duty to find a replacement tenant for a lease that is at or above market since it was entered into the last two years. That claim would likely be significant. Furthermore, removal of the improvements may give rise to damage claims. In addition, the cost of liquidation will include the cost of vacating the debtor's plant in Manhattan, Kansas, including damage claims, if any, and salaries and other employee expenses incurred during the liquidation. These costs are not spelled out. They should have been. Realization of value in liquidation is not accomplished through merely turning over the keys to a trustee.

### D.

■ With respect to the values obtainable in liquidation, the parties sharply debate the nature of the hypothetical liquidation envisioned. From the testimony of its author, it appears that the liquidation envisioned in the Disclosure Statement is to be done in a brief period of time. At one point, he referred to flooding the sewing pattern market with the 26 million patterns that are currently in the Debtor's inventory. Tr. 141–142; H. 63–64. The Disclosure Statement analysis estimates a $1 million cost to liquidate. But this sum, stated to be for liquidators' fees, Discl.Stmt, p. 4-4, does not purport to cover the costs incurred in a longer period. Lewis posits a far more orderly liquidation, basically envisioning that the Debtor would continue to sell existing inventory at a discount in the wholesale market.

Section 1129(a)(7)(A)(ii) speaks of a comparison between plan values on the effective date and those to be hypothetically received were the Debtor liquidated "on such date." An overly literal reading of these words would indicate that Congress intended comparison with a fire sale taking only one day. We strongly doubt that this is what Congress intended. Section 704, in setting forth the duties of a Chapter 7 trustee, contains no such intimation. Rather it permits a trustee with court approval to continue to operate a business for a limited time, 11 U.S.C. § 704(8), and speaks in terms of flexibility requiring a trustee to

"collect and reduce to money the property of the estate ... and close such estate as expeditiously as is compatible with the best interests of parties in interest." 11 U.S.C. § 704(1). As explained in a principal treatise:

> The trustee may carry out the mandate of this provision by collecting accounts; by instituting necessary legal actions; by securing the necessary orders to compel the debtor or others to deliver over property belonging to the bankrupt estate; by selling the real and personal property of the estate; by carrying out or rejecting executory contracts entered into by the debtor prior to his adjudication, by proceeding to set aside fraudulent or preferential transfers or liens; or by submitting claims to arbitration or compromise. In short, it is the trustee's duty to both the debtor and the creditors to realize from the estate all that is possible for distribution among the creditors and to this end he may assert claims and collect assets even though, in many cases, the debtor would be estopped.

4 *Collier on Bankruptcy* ¶ 704.01[3] (15th ed. 1989) (footnotes omitted).

Here, it would appear that an orderly liquidation, through retaining a small staff to ship out, as ordered, the inventory remaining at the Debtor's premises, to order, perhaps, the printing of additional copies of catalogues necessary to sell that inventory, *see* Tr. 136, and to take care of the myriad of other tasks necessary to winding down the business would be the path a prudent trustee would take in satisfying his duty of maximizing a distribution to creditors.

The industry in which the Debtor operates is fairly oligarchic in nature. The Debtor has a 35.7% market share and only two principal competitors. This is not a case where a restaurant has closed and a trustee needs to immediately sell furniture in order to avoid an additional month's rent or where the supply of goods in established stores outstrips whatever demand may remain for the debtor's product. To be sure, the patterns are seasonal in nature because the garments that can be made from them are seasonal in nature. And to be sure,

styles do change and some patterns are discarded in recognition of changing styles. But there is no indication that competition could step in immediately to service the demand for the Debtor's patterns evidenced by its market share or that those patterns cannot be liquidated in an orderly fashion rather than in a fire sale. It is with these notions in mind that the Debtor's assets are to be evaluated.

E.

In calculating an estimated realizable value of the Debtor's assets in a Chapter 7 liquidation, the Disclosure Statement itemizes various assets and calculates a liquidation value of $35,460,000 on the basis of various assumptions. Two mistakes are admitted: cash should be reduced by $168,000, H. 50–51; Tr. 146–47, and trade receivables should be reduced by $669,000 because of the erroneous inclusion of a receivable from shareholders which is separately listed. H. 53; Tr. 146–47. In other respects, the valuation of trade receivables at $14,667,000 ($15.33 million stated in the Liquidation Analysis less $669,000), or roughly 75% of book value, appears to be reasonable, Tr. Erickson 18, even though the Debtor has a bad debt reserve of 0.5%, H. 72, in light of the general difficulties bankruptcy trustees have in collecting receivables.

1. *Inventory*

More material is the dispute concerning the value of the Debtor's inventory. Of its book value of net inventory of $9.504 million, the Debtor's books reflect a book value of raw materials of $1.178 million, reduced by 50% in liquidation. H. 19. This appears to be reasonable; perhaps a buyer might pay 60% of book value. Tr. Erickson 10. For its $501,000 book value of work in process, the Debtor assigns no value in liquidation. This also appears to be reasonable. Generally, a trustee might realize 10–15% of work-in-process, Tr. Erickson 10, or $50,100 to $75,150. Partially completed patterns for specific designs would not appear to have any market.

It is in valuing the Debtor's finished goods inventory that the parties sharply clash. That inventory consists of 6.3 million patterns located at the Debtor's facilities in Manhattan, Kansas and about 20 million patterns held by dealers on behalf of the Debtor on "standing debit" or a consignment basis. Tr. 129.

These finished goods have a book value of $8,280,000. In the Liquidation Analysis, it is estimated that in a Chapter 7 liquidation, $3.6 million would be realizable from the finished pattern inventory held by McCall's dealers at 15 cents per pattern or 45% of cost. Discl.Stmt, Ex. 4, p. 4–3 and Tr. 141–42, Tr. Erickson 11. No value was given to the completed patterns located at the Manhattan, Kansas facility, although the only difference between the field inventory and the retained inventory is location. H. 60; Discl.Stmt, Exh 4, p. 3, n. (a).

In justifying a value of 15 cents per pattern for patterns held by dealers and a "best case" value of 20% of wholesale, Tr. 135, 140, the author of the Liquidation Analysis stated that he assumed that liquidation entailed flooding the market with patterns, Tr. 141–42, and asserts that the "best deal" the Debtor could make with respect to inventory held by dealers leaving the pattern business was 20% of wholesale, Tr. 134–35. He added that chain stores have sometimes discounted patterns up to 80%, Tr. 135, or to less than wholesale. In justifying no value for patterns held on its own premises, he stated that these patterns may not be covered by the current catalogue and cannot be sold otherwise. Tr. 136.

As noted above, the first of these assertions does not appear to be plausible with respect to this Debtor and the market in which it holds a 35.7% share. Nor does the absence of catalogues appear to justify a zero value for some 6.3 million patterns located on the Debtor's premises. Since the Debtor does not retain dated or discarded patterns, Tr. 23–24, these patterns are current. The Debtor's current catalogue consists primarily of pages from former catalogues with new pages concerning new patterns inserted. Tr. 40. On this record, it would appear that the retained patterns are largely reflected in the current catalogue. No reason has been advanced why additional copies could not be printed if needed or why dealers would not continue to obtain patterns, albeit at a discount.

That stores have sometimes discounted patterns is also of little significance. This is a Debtor which projects $2.7 million of net after tax income for 1991. Discl.Stmt, Ex. 5. That projection is totally inconsistent with any notion of widespread discounting by retailers to a price below wholesale.

Nor can it be said that prior instances of dealer liquidation provide much assistance in evaluating the Debtor's inventory. Prior liquidation history is a strong indication of liquidation value. But the liquidations referred to here are of dealers discontinuing their pattern lines presumably because of lack of success. In such instances, a lower value is to be expected. Under consideration here, however, is the orderly liquidation of the Debtor, a successful entity whose patterns command a significant market share and could be liquidated through successful dealers or direct sales to stores. That history does not appear to be of much weight here.

Of greater weight is that in liquidation, a significant amount of merchandise might be returned, Tr. Erickson 72, demand for the Debtor's patterns will likely diminish, and that discounts will be given. John Erickson, an accountant having great familiarity with liquidations in Chapter 7, testified that an orderly liquidation usually results in receipt of 25 to 70% of wholesale value. Tr. Erickson 38–39. At a $3.00 per pattern wholesale price, these values translate into a range of $19,725,000 to $55,230,000 for all of the Debtor's pattern inventory.

On the basis of the entire record it appears that the most probable orderly liquidation value of this inventory lies between 45% and 55% of wholesale. The factors noted above, and added shipping, packing and possible additional catalogue costs relating to the Kansas inventory, indicate that higher amounts are likely not achievable. The nature of this industry and the

Debtor's role in it indicate that lower amounts are inappropriate. We thus find the orderly liquidation value of the Debtor's finished goods inventory ranges between $35.505 million and $43.395 million.

## 2. Cabinets

To store its inventory with dealers, the Debtor owns approximately 20,000 (or perhaps 24,000) cabinets, H. 80, 81; Tr. 129–30. The Liquidation Analysis gives them no value. The Debtor has, however, sold some cabinets to dealers at $5 to $10 each, Tr. 133. With this history, a zero value is inappropriate. Tr. Erickson 46–47. Instead, they should be valued at $100,000 to $200,000.

## 3. Machinery and Equipment

According to the Disclosure Statement, these items are carried at $5.153 million net on the Debtor's books, H. 83, and valued at $0.87 million on the Liquidation Analysis. This figure concerns only an envelope press, guide press and shelving. The other machinery and equipment, *i.e.*, tissue presses and folding machines, were believed to be scrap upon liquidation and valued at zero. H. 85; Tr. 143. Most of the machinery and equipment is described as highly specialized, H. 20; Tr. 142–44, as very old and having an original basis of $7 million, Tr. 89, and of value only on a going concern basis. H. 20; Tr. 142–44. Erickson testified that the Debtor was unlikely to receive anything but scrap value for the specialized machinery and equipment, Tr. 13, and added that his experience is that recovery of 10%–20% of their book value is not unusual, Tr. Erickson 43–44. He considered the industry demand for the equipment as important for evaluation, Tr. 41. Neither the Debtor nor Erickson made inquiry of such demand. H. 86; Tr. Erickson 43.

In light of the special competitive posture of this industry, however, valuation of this machinery and equipment should reflect a value for the specialized tissue presses and folding machines notwithstanding their age. Were the Debtor liquidated, it would appear that competitors will desire this equipment in order to increase their own market share. The age of the equipment may reduce the price, but not to scrap value. The higher value of 20% of book value, or $1.4 million, testified to is more reasonable and accepted here.

## 4. Leasehold Improvements and Building

Having a book value of $3.056 million, the Debtor assigns a liquidation value of $926,000 to its leasehold improvements at its New York offices (book value $1.4 million) and Manhattan, Kansas premises. It justifies this 30% valuation on the basis of the specialized nature of the improvements and their consequent lack of significant value to a new tenant. H. 21. Erickson testified that receipt of 30% to 40% of book value for leasehold improvements is acceptable. Tr. Erickson 16. There is no factual basis on this record to differ with the Debtor's assessment.

Nor is there any basis to criticize the Debtor's valuation of its leases for its Manhattan, Kansas, plant and its New York offices at nil. Although these leases have several years to run, particularly the Kansas plant lease which can be extended to 2005, there is no dispute that the rent is at or above market value for long term leases. Thus, there would be little incentive for a prospective assignee to pay a premium when it would pay the same, or perhaps less, rent if it dealt with the landlords.

## 5. "Construction in Progress"

Carried, according to the Disclosure Statement, at $1.207 million on the Debtor's books and evaluated as $0.525 million (or 43% of the book value) in the Debtor's Liquidation Analysis, this item consists of various partially completed asset projects that are located mostly in Kansas and partly in New York. H. 98. That figure was chosen, presuming a semi-completed state that would not be completed, and relying on prior consultation with counsel. H. 99. Erickson viewed a 50% realization as possibly a bit high with regard to the Kansas project but assumed the estate would re-

ceive some proceeds from the New York project. Erickson Tr. 17.

Although the 43% of book value employed in the Liquidation Analysis is arbitrary, it is not unreasonably low and may in fact be overstated. These projects apparently relate to the leased premises in New York and Kansas. Unless packaged with the leases or, at least, with sale of the leasehold improvements, the opportunity for realizing value would appear to be low. Since the leases themselves are at market value, there does not appear to be significant opportunity to sell these projects.

### 6. *Goodwill and Intangibles*

The Debtor's books and records carry good will and intangibles at $48,297,000. Of this amount, $45 million is attributed to goodwill, H. 121. No value was attributed to good will and intangibles in the Debtor's Liquidation Analysis.

The principal assets falling in this category are (a) the Debtor's perpetual rights, pursuant to contract, to use the trademark "McCall" in connection with the sewing pattern industry, (b) license agreements with certain well-known fashion design houses enabling the Debtor to sell garment designs, (c) distribution contracts relating to the sale of the Debtor's products in certain foreign markets, (d) computer software, (e) the Debtor's greeting division and other items such as a fashion magazine and subscription and customer lists.

At the confirmation hearing, the author of the Liquidation Analysis changed his testimony to state that in the best case, some $4–5 million might be received in liquidation on the sale of the limited right to use the trademark, Tr. 148–149. He had earlier testified that the name had no value, not even to the Debtor's competitors, H. 118, 149.

The name "McCall" is long established in the home serving industry. 1989 Form 10–K p. 2. The "target market" of individuals making garments at home "is difficult to reach through standard, mass-media advertising." *Id.* at 7. Thus, the name has a value.

One of the difficulties in establishing value on the basis of the hypothetical liquidation referred to in section 1129(a)(7)(A)(ii) of the Code is that the liquidation is just that—hypothetical. The exercise assumes a state of facts inconsistent with a debtor's present prospects as a going concern.

Lewis, in contending that the value of the name "McCall" can be calculated on the basis that a competitor would purchase the name, assumes that the buyer would pick up the Debtor's market share through using the name, and attempts to value the name, calculated at $33.5–37.7 million, on the basis of the present value of the resulting hypothetical income stream to each of the Debtor's two principal competitors. Lewis Proposed Findings of Fact ("FOF") #60. This set of assumptions shows the danger in selective valuation of intangible assets. The valuation ignores that other intangibles such as marketing skills, quality, consistency, and advertizing programs in combination with a recognized name, may account for market share. Legion are the instances where a company having a well recognized name tinkered with its product to the detriment of market share and product acceptability. It simply cannot be said that, were the Debtor liquidated and the name purchased, the purchaser would *ipso facto* obtain the Debtor's market share. Moreover, new entrants may emerge and other competition may increase their market shares.

The name "McCall" has value but its value in isolation of other non-saleable factors such as those mentioned above is limited. In that light, a range of $4–5 million is reasonable.

The author of the Disclosure Statement also changed his testimony to value its license agreements "in the best case" at $900,000 but believes that that amount will not be obtained in liquidation. Tr. 122. These two year agreements with Laura Ashley, CP Shades, The GAP, Raggedy Ann and other recognized names, H. 102, have an average remaining term of one year. Tr. 120. They are automatically renewable unless cancelled by either party. 1989 Form 10–K p. 7. Products sold under

those agreements generated $8.4 million net sales in 1989. Tr. 119.

Lewis suggests that these agreements be valued by computing an after tax income of $3.5 million attributable to these licenses and that one of the Debtor's two principal competitors would purchase the income. FOF # 52 & 53. This analysis suffers from the same failure to recognize that intangible factors regarding sales cannot be viewed in isolation. It also ignores the substantial market shares of these two competitors indicating that they have their own marketing devices. As Lewis alternatively suggests with respect to the trademark, these agreements may be of more interest to a competitor seeking to reduce competition through purchasing them. In that light, given that they have only one year remaining subject to renewal rights, if any, a valuation of $700,000 to $900,000 appears appropriate.

The Debtor's Liquidation Analysis estimates a nil value for foreign distribution contracts pertaining to the sale of its products in Australia, Canada, Mexico, The United Kingdom, Puerto Rico and China and a joint venture agreement affording the Debtor with the ability to sell its products in U.S.S.R. and in eastern Europe. H. 122–23. Its author was not aware that such contracts are often assignable in bankruptcy. H. 123–24.

Roughly 10% or $6.2658 million of the Debtor's sales are in foreign countries. 1989 Form 10–K p. 5. Nevertheless, the U.S.S.R. joint venture is a start-up operation. Tr. 18. The Chinese arrangement has not produced a profit. Tr. 14. The Debtor's major competitors do business in Canada, Australia, Mexico, The United Kingdom and Puerto Rico. Tr. 11–12. No reason appears why they would pay anything to obtain these operations. We thus conclude that no liquidation value is to be given to these arrangements.

Similarly, we conclude that the Debtor did not err in giving a zero liquidation value to its specialized computer software. Although the software employed in making patterns is unique, Tr. 60–61, the prospective purchasers, namely, the Debtor's major competitors, have their own programs, Tr. 62. The Debtor's management information system employed to process orders may have some value limited by the daily maintenance required, Tr. 65. The liquidation value, if any, of these systems would not appear to be material. Similarly, if there is any value to the Debtor's fashion magazine, operated in 1989 at a net loss, Tr. 44, a subscription list of 16,500 individuals, a list of dealers and a school mailing list, that value would also appear to be immaterial.

The Debtor's greeting card division appears to have some value. Revenues are $400,000–500,000 per year, Tr. 57–58. After a loss in 1989, it may break even in 1990, Tr. 57. Perhaps someone who wanted to take the risk of growing the business in these recessionary times would pay $100,000 to $200,000 at most. Perhaps not. The sum is not material. For purposes of this analysis we assign it a value of $100,-000.

In total, and taken together with prepaid expenses of $68,000 prepaid taxes of $139,-000 and "other assets" valued at $1,271,-000, these amounts indicate that the value of the Debtor's assets for purposes of section 1129(a)(7)(A)(ii) ranges between $71,-600,000 and $81,500,000.

### F.

Valuation, however, is not an exact science, nor is it a product of mere calculation. It is an imprecise tool, perhaps the best we currently have, designed to reach a calculated decision on the basis of the hypotheses and assumptions in light of a set of facts. *See In re Beker Industries*, 58 B.R. 725, 739 (Bankr.S.D.N.Y.1986). To be sure, the command of section 1129(a)(7)(A)(ii) is perhaps the strongest protection creditors have in Chapter 11. Non-assenting creditors are to be given in a plan not less than they would receive in a Chapter 7 liquidation. The judgment is to be made on the basis of "evidence, not assumptions." *In re Northeast Dairy Coop. Fed'n, Inc.*, 73 B.R. 239, 253 (Bankr.N.D.N.Y.1987). But, the exercise is hypothetical and valuation evidence is often replete

with assumptions and judgments. For example, a simple appraisal of a house is based on the assumption that the real estate market will not shift in the period that it will take to sell the house and the judgment that comparable properties are truly comparable. The judgments made here are on the basis of assumptions regarding the desirability of various assets principally to the Debtor's main competitors in a fairly oligarchic but declining market of which the Debtor commands a 35.7% share in light of the evidence pertaining to those assets.

Lewis contends that the Debtor has not met its burden of proof in that it did not contact those competitors and its customers in order to learn of the price they would pay for various assets in a hypothetical liquidation and asserts that the Debtor should have produced appraisal evidence. Expressions of hypothetical offers might be of interest but it is readily apparent that no such evidence should be required. It is hard to envision anything more inimical to a plan based on a debtor's continuance as a going concern or, as here, a plan grounded on the sale of the debtor as a going concern. To inject into the marketplace the notion that a debtor might liquidate, even hypothetically, may sow the seed of its own destruction. Customers may consider alternatives, competitors may pounce, employees might seek more secure positions. Section 1129(a)(7)(A)(ii), in charging the Court with making the determination that non-assenting creditors will receive the same or more under a plan than they would in a Chapter 7 liquidation, does not require the hypothesis to become a possible reality.

Nor should appraisal testimony be the *sine qua non* of compliance with the best interests of creditors test codified in section 1129(a)(7)(A)(ii) in a case such as this. Albeit, generally such evidence should be presented, R.F. Broude, *Reorganizations Under Chapter 11 of the Bankruptcy Code* § 12.10 at 12–19 (1986), but the market for this Debtor's assets is narrow, consisting of (i) its principal competition who

may desire its machinery and equipment, its trademark and its agreements with fashion design houses, (ii) its dealers and their customers who may desire its completed patterns; and (iii) a few others who might desire its leasehold improvements and construction in progress. It is highly doubtful that a general appraiser could testify meaningfully as to at least the first two of these topics. This case is not the ordinary case involving a debtor having assets that are commonly liquidated and with which an appraiser would have familiarity.[12]

More persuasive than the absence of an appraisal in this case is that this Debtor has been shopped extensively. The four times it has been placed on the auction block have resulted in bids ranging, in addition to adjustments and assumption of certain claims, from $40 to 45 million. *See In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877 at 878–79, 20 Bank.Ct.Dec. 1012 (Bankr.S.D.N.Y.1990). This history is far more persuasive than an appraisal. If hypothetical liquidation values indicate a significant premium over the net purchase price to be received in such circumstances, one is likely to reexamine those values.

Here the purchase price consists of $45,000,000 in cash, a purchase price adjustment of $2,160,000 (= 2,313,000 − 153,000, *see* H. 25–26; Tr. 76–77), and assumption of $2,837,000 in claims largely consisting of trade debt, accrued vacation pay and unfunded pension fund liabilities, Tr. 87, 93–97, and $22,344,000 in administrative and other priority claims. Discl.Stmt, p. 4, Ex. 4, p. 4–4 n. (a). In face amount these total $70,181,000. That amount strongly supports, given the hypothetical nature of the exercise, the liquidation value range of $71,600,000 to $81,500,000 that we have found through independent analysis of each material category of assets.

## G.

The next step in this process is computation of the return in liquidation to

---

12. Section 70f of the former Bankruptcy Act, 11 U.S.C. § 110f (repealed), required appraisals prior to the sale of estate property. Its Bankruptcy Code counterpart, section 363(b), dispensed with that requirement.

non-assenting creditors in light of the range of value found, non-subordination of the Senior Notes held by Travelers, and the recognition that, although administrative and priority severance pay and vacation pay are overstated, the cost of orderly liquidation is understated.

The Debtor's books reflect $26,808,000 of administrative expenses and priority claims. Discl.Stmt, Ex. 4, p. 4–4. If that sum is reduced by $1 million to reflect the reduction of priority severance and vacation pay claims and a conservative increase in liquidation costs noted in part IV–C of this Opinion, priority claims would be estimated at $25.8 million. Subtraction of that sum from the range of values found above leaves a range of $45.8 to $55.7 million to pay unsecured creditors.

The Debtor's books reflect a total of $5.97 million in unsecured debt, excluding interest,[13] the Senior Notes, Debentures and Junior Notes. Discl.Stmt, Ex. 4, p. 4–1. To this is to be added a significant portion of severance pay and vacation pay. Calculation of the amount to be received by the Debentureholders must reflect that this debt of $5.97 million is, unlike the Debentures, not subordinate to the Travelers claims; nor are the Debentures or Junior Notes subordinate to it. The Travelers' claims of $42.8 million, the Debentureholders claims of $21.8 million, the Junior Notes of $7.5 million and other debt of $5.97 million total some $78 million. On a *pari passu* basis, a liquidation valuation of $45.8 million in assets yields a 58.7% (45.8 divided by 78) dividend. Thus, holders of the other debt would receive $3.5 million and the $12.5 million payable to the Debentureholders would, due to the subordination, be paid to Travelers until Travelers' $42.8 million claim is paid in full. Thus, the Debentureholders would receive zero. The same calculation with respect to the high end of the range of liquidation values ($55.7 million) shows that the debt of $5.97 million would receive $4.76 million (71.4%) leaving $51.44 million to be distributed. Of this amount Travelers would be paid its claim of $42.8 million in full, leaving $7.2 million for the Debentureholders. Under the Plan, Debentureholders are to receive 22.6044% of the first $40.7 million of merger proceeds ($10.197 million) and 50% of the remainder. Even were the $4 million reserve for indemnification claims, see p. 3 *supra*, fully exhausted, Debentureholders would receive an additional $500,000. Thus, the non-assenting Debentureholders will receive more under the Plan than in a Chapter 7 liquidation.

This conclusion has not been reached lightly. The upper range reflects the so-called best case scenario. Yet even under that scenario, the Plan provides a greater return. Moreover, this analysis may understate liquidation costs, see Part IV–C *supra*, and does not include the non-priority portion of the severance and vacation pay claims noted above and the indemnification claims by former officers and directors that have been filed. Adding those costs and claims to the pot would reduce the return to Debentureholders in liquidation.

For all the foregoing reasons, we hold that section 1129(a)(7)(A)(ii) has been satisfied.

### V.

■ Based on the record before us, the conclusion that non-assenting Debentureholders will receive a likely maximum of $7.2 million from a liquidation under Chapter 7 casts considerable doubt as to the adequacy of the Liquidation Analysis contained in the Disclosure Statement. That analysis failed to analyse the limitations and uncertainties regarding priority claims. It estimated a zero return to Debentureholders principally on the ground that only approximately $35 million is estimated to be realized from the Debtor's assets in liquidation. The evidence here, as discussed above, indicates a liquidation value ranging from $71.6 to $81.5 million.

---

**13.** Interest on unsecured claims is not allowed, see *United Sav. Ass'n v. Timbers of Inwood Forest Ass'n, Ltd.*, 484 U.S. 365, 372–73, 108 S.Ct. 626, 630–31, 98 L.Ed.2d 740 (1988), unless the debtor is solvent. *See* 11 U.S.C. § 726(a)(5).

These differences are hardly immaterial. They and the testimony of its author indicate that the Liquidation Analysis was prepared without recognition of the nature of this industry and the Debtor's significant place in the market for its goods. In this respect, it can no longer be said that the Disclosure Statement contained adequate information on the key issue of whether the Plan satisfies the best interests test.

■ Section 1129(a)(2) of the Code requires that the Court find compliance by the plan proponent with applicable provisions of the Code prior to confirming a plan. Although the Court determined, prior to transmission of the Disclosure Statement to creditors, that it contained "adequate information" as required by section 1125(b) of the Code, that issue can be revisited at the confirmation hearing. *See In re Prudential Energy Corp.*, 58 B.R. 857, 867–68 (Bankr.S.D.N.Y.1986). At the "heart" of the chapter 11 process is the requirement that holders of claims in impaired classes be furnished a proper disclosure statement "that would enable a hypothetical reasonable investor typical of claims or interests of the relevant class to make an informed judgment about the plan." H.R.Rep. No. 595, 95th Cong., 1st Sess. 408 (1977), U.S.Code Cong. & Admin. News 1978 pp. 5787, 6364. The test parallels the materiality standard adopted by the Supreme Court with respect to proxy solicitations under section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78 (1975), and Rule 14a–9, 17 C.F.R. § 240.14a–9 (1975), promulgated thereunder. *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976) ("an omitted fact is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding how to vote"). If it appears that a disclosure statement is materially erroneous or inadequate, the Court

simply cannot make the finding required by section 1129(a)(2).

■ Given the necessity for adequate information in the Disclosure Statement and the paramount position section 1125 occupies in the Chapter 11 process, there is little, if any, room for harmless error. A materiality standard, focusing on the information needed by a "hypothetical reasonable investor typical of holders of claims or interests of the relevant class", 11 U.S.C. § 1125(a)(1), itself distinguishes the inconsequential from the significant.

In this case, it is apparent that the Liquidation Analysis contained in the Disclosure Statement is significantly in error. It is also clear that a hypothetical reasonable investor typical of a Debentureholder would view the possibility of a return under liquidation as significantly altering the total mix of information made available to him in the Disclosure Statement which predicted no return to Debentureholders in liquidation. *See TSC Indus.*, 426 U.S. at 449, 96 S.Ct. at 2132.

It might be argued that the errors make no difference in light of the Court's finding of satisfaction of the best interests test. It might also be argued that the errors make no difference because the Plan may be confirmable under section 1129(b) regardless of the vote of the Debentureholders because the Plan seemingly tracks the absolute priority rule with respect to Debentureholders in that it provides for payment in full to them prior to a dividend to junior classes.[14]

■ The command of section 1129(a)(2) for compliance with the Code, however, does not admit inquiry as to whether a class would have approved a plan notwithstanding the error or whether approval by that class is required. Disclosure statements are required to contain liquidation analyses that enable creditors to make their own judgment as to whether a plan is

---

14. Section 1126(c) requires that a majority in number and two thirds in amount of the claims voted in a particular class approve a plan in order for the class to accept the plan. If a class of unsecured creditors does not accept the Plan, it is entitled to the protection of the absolute priority rule set forth in section 1129(b)(2)(B)(ii). If a non-accepting class is given that protection, *i.e.,* payment in full prior to payment to junior classes, the Plan may be confirmed provided at least one impaired class has accepted the plan.

in their best interests and to vote and object to a plan if they so desire. The protections of creditors at confirmation and during the confirmation process are exceptionally strong. *See, e.g., Crowthers McCall,* 114 B.R. at 881. The confirmation process and the protections of creditors are not to be denigrated by a liquidation analysis such as that presented in this case.

What remains is consideration of the course to take from here. Were this a case where the plan proponents had failed to prove that the best interests test or the feasibility standards of section 1129(a)(11) had not been met, an order denying confirmation should be entered because the record is closed. This, however, is not such a case. It is a case where the other requirements have been met but the Disclosure Statement is materially in error. The remedy is to not accept the vote and to require the Plan proponents to transmit a corrected liquidation analysis and ballot to holders of claims in impaired classes, together with an explanatory notice approved by the Court after notice to the parties appearing at the confirmation hearing. Section 1129 does not preclude such a remedy; rather, it precludes the Court from confirming a plan absent compliance with the Code. In this case, where there is no dispute that the plan proponents have attempted to comply in good faith, such a remedy is appropriate.

The foregoing constitutes this Court's findings of fact and conclusions of law. The plan proponents are to proceed in accordance with this opinion. It is

SO ORDERED.